******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* TYQUAN TURNER
## (SC 20186)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Convicted of the crimes of felony murder, robbery in the first degree, and
conspiracy to commit robbery in the first degree, the defendant appealed,
claiming, inter alia, that his federal due process right to a fair trial was
violated when the trial court improperly admitted testimony from a
police officer, W, and other evidence regarding the location of the defen-
dant's cell phone on the day of the victim's murder. The victim had
been fatally shot while standing on a sidewalk when he was approached
by two people who fired a series of gunshots. The victim's medallion
and gold chain were later recovered at a nearby pawn shop. W testified
that he had performed a call detail mapping analysis of the defendant's
cell phone, which the police recovered after the shooting, and generated
cell tower coverage maps and a time lapse video showing the movement
of the cell phone. The state relied on the cell tower coverage maps to
establish that the defendant was in the area of the crime scene at the
time of the shooting and in the area of the pawn shop after the shooting.
The Appellate Court concluded that the defendant's claim was unpre-
served and unreviewable under *State* v. *Golding* (213 Conn. 233), as
modified by *In re Yasiel R.* (317 Conn. 773), because it was evidentiary
and not constitutional in nature. In addition, the Appellate Court declined
to review the defendant's claim under the plain error doctrine, conclud-
ing that defense counsel had assented to the admission of the cell phone
evidence that the defendant claimed violated his right to due process.
The Appellate Court also declined to review the defendant's claim under
its supervisory authority over the administration of justice, concluding
that the defendant had failed to present extraordinary circumstances
that warranted such review. Accordingly, the Appellate Court affirmed
the judgment of conviction. On the granting of certification, the defen-
dant appealed to this court, claiming, inter alia, that the Appellate Court
incorrectly concluded that he was not entitled to *Golding* review of his
unpreserved claim that the trial court violated his right to a fair trial
by admitting W's testimony and the cell phone evidence without conduct-
ing a hearing pursuant to this court's decision in *State* v. *Porter* (241
Conn. 57), which held that testimony based on scientific evidence must
be assessed to determine whether it is derived from and based on reliable
scientific methodology. *Held*:

1. The defendant having failed to establish that any error occurred in the
   admission of W's testimony and the cell phone evidence, he was not
   entitled to review of his unpreserved claim under *Golding*: this court
   having determined, contrary to the defendant's claim, that its recent
   decision in *State* v. *Edwards* (325 Conn. 97) did not obligate the trial
   court to conduct a *Porter* hearing to assess the reliability of W's testi-
   mony and the cell phone evidence in the absence of a party's request
   for such a hearing, and the defendant having failed to request such a
   hearing or to object to the admission of W's testimony and the cell
   phone evidence, his claim, which was evidentiary in nature, was unpre-
   served and there was no error, and, accordingly, the defendant could
   not establish that the trial court's failure to conduct such a hearing sua
   sponte was constitutional in nature or violated his constitutional rights
   under the second and third prongs of *Golding*; moreover, because the
   defendant failed to request a *Porter* hearing, the record was unclear as
   to what the trial court would have done if he had requested such a
   hearing, and this court declined to find facts not in the record or to
   presume that the trial court committed evidentiary error when it was
   never asked to decide the issue; furthermore, the record was inadequate
   to determine whether W's cell tower coverage map evidence satisfied
   the requirement of *Porter* that the proffered scientific testimony be
   demonstrably relevant to the facts of the case, as it was impossible to
   determine, without a *Porter* hearing or an objection to W's testimony

and the cell phone evidence, whether the state would have been able to satisfy that requirement.

2. The defendant could not prevail on his claim that the trial court's failure to conduct a *Porter* hearing constituted plain error; this court declined the defendant's request to adopt the federal plain error standard, under which the determination of whether an error was clear is made on the basis of the law existing at the time of appeal rather than the time of trial, and, because the case law existing at the time of the defendant's trial did not guarantee the defendant the right to a *Porter* hearing regarding cell phone data, this court could not conclude that the plain error doctrine afforded the defendant any relief.

3. This court declined the defendant's request to exercise its supervisory authority over the administration of justice to review his unpreserved claim that the trial court improperly had admitted W's testimony and the cell phone evidence without conducting a *Porter* hearing, as this case did not present the exceptional and unique circumstances that would justify the exercise of such authority, and this court's decision not to exercise its supervisory authority was consistent with its holding in *Edwards*, as *Edwards* entitles a defendant to a *Porter* hearing regarding cell phone data only upon request, and the defendant failed to request such a hearing.

Argued September 25, 2019—officially released February 18, 2020

*Procedural History*

Substitute information charging the defendant with the crimes of murder, felony murder, robbery in the first degree and conspiracy to commit robbery in the first degree, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Kwak, J.*; verdict and judgment of guilty of felony murder, robbery in the first degree and conspiracy to commit robbery in the first degree, from which the defendant appealed to the Appellate Court, *DiPentima, C. J.*, and *Bright* and *Eveleigh, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Ann M. Parrent*, assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. In this case, we are asked to determine whether, in light of our recent decision in *State* v. *Edwards*, 325 Conn. 97, 156 A.3d 506 (2017), the defendant, Tyquan Turner, is entitled to review of his unpreserved claim that the trial court improperly failed to sua sponte conduct a hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), before admitting expert testimony regarding cell phone data and corresponding cell tower coverage maps. The defendant seeks review under (1) *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), (2) the plain error doctrine; see Practice Book § 60-5; and (3) this court's supervisory authority over the administration of justice. We conclude that, because the defendant has failed to establish that any error occurred, he is not entitled to any review of this unpreserved claim. Accordingly, we affirm the Appellate Court's judgment.

The following facts, as set forth by the Appellate Court in *State* v. *Turner*, 181 Conn. App. 535, 187 A.3d 454 (2018), and procedural history are relevant to our review of the defendant's claims. On the afternoon of July 13, 2013, the victim, Miguel Rodriguez, was standing on the sidewalk in front of 10-12 Flatbush Avenue in Hartford. Id., 539. Two people approached the victim from an open parking lot alongside 10-12 Flatbush Avenue and fired two series of gunshots. Id. Shortly thereafter, the police and emergency response personnel found the victim, who was being tended to by residents of 10 Flatbush Avenue. Id. The victim later was pronounced dead at Hartford Hospital. Id. Although two eyewitnesses gave statements, the victim's family and friends, who were present when the shooting occurred, were unwilling to provide any information about the incident. They did, however, notify the police that the victim was missing a gold chain and a medallion. Id. The gold chain and medallion were later recovered at a pawn shop. Id., 540. At about this time, the police also received a phone call from someone who identified as a friend or family member of the victim, and who implicated the defendant in the victim's death. Id. Approximately one month later, while at an intersection in the north end of Hartford, Detective George Watson observed the defendant, who " 'took off' " but dropped his cell phone. Id.

Alexandra Colon, the mother of the defendant's child, identified the recovered cell phone as being owned by the defendant, on the basis of a crack in the phone's screen, and provided the police with the phone number associated with the phone. Id., 541. "With that number, [the police] confirmed that Sprint Corporation (Sprint) was the defendant's cell phone carrier, and, thereafter,

a subpoena was issued, ordering Sprint to produce the defendant's cell phone records from July 13, 2013, the day the homicide occurred, through August 6, 2013, the day the phone was recovered. Sprint's response to the initial subpoena was incomplete and did not include any records for July 13, 2013. The subscription information, however, indicated that the cell phone number was changed on July 14, 2013, the day after the crime, at the request of a person by the name of 'Patrick.'[1] In response to a subsequent subpoena, Sprint produced the cell phone records, associated with that prior phone number, for July 13, 2013.

"[The police then] sent the cell phone records and locations of investigative interest to Andrew Weaver, a sergeant in the Hartford Police Department's special investigations division, who performed a call detail mapping analysis. Weaver input that data into a computer program called Oculus GeoTime, and produced a time lapse video visually representing the movement of the defendant's cell phone between approximately 3:04 and 6:48 p.m. on the day of the crime. Weaver also took screenshots of the video at different times between approximately 3:24 and 5:08 p.m. on the day of the crime." (Footnote added; footnotes omitted.) Id., 541–43.

At trial, Weaver and Ray Clark, a custodian of records at Sprint, were called to testify as prosecution witnesses. On direct examination during the state's case, Clark identified the defendant's account subscription information, July 14, 2013 customer service record, and call detail records. Those three documents were admitted into evidence without objection. On cross-examination, Clark testified that the call detail records allow a person to determine where a call was generated and where it ended in relationship to a particular cell site. Clark clarified, however, that "you can't pinpoint and say [the phone] has to have been exactly here. This record simply says it had to have been in the vicinity of this particular cell site at the time the phone call began and, likewise, at the time the phone call ends." Clark explained that a cell phone is within the vicinity of a particular cell site when it is within the range of that cell site, the range being approximately two miles in larger cities like Hartford.

Weaver was called to testify next. The state did not disclose Weaver as an expert witness, although the trial court instructed the jury that he provided expert testimony. Weaver testified that he oversaw computer based investigations of adult and juvenile sexual assaults and missing persons, including cell phone forensics and cell phone mapping (also known as call detail mapping). He testified that he had received training in call detail mapping and had taken courses on geolocating of cell service, which included learning how to map which cell tower a particular call is routed through. He testified

that he had undertaken hundreds of hours of training in call detail mapping.

In explaining the process he undertakes to conduct call detail mapping, Weaver testified that first he receives the call detail records from the cell phone company, which usually include information identifying which cell tower was routing the call, the coordinates of the tower, and which side of the tower the call was routed through. He explained that "[m]ost cell towers have . . . three sides. [Each side] primarily cover[s] a 120 degree arc. That's the coverage area of the—the antennas. So, you'll have one tower with three antennas on it, 120 degree arc. And that's your 360 degree coverage area." When the cell towers are designed, engineers map the area, determine each tower's coverage area, and then record that information, which is then provided to Weaver through the call detail records. This information is then inputted into a computer program called Oculus GeoTime and results in a map that visually represents the calls over time.

In describing the coverage range of the cell towers, Weaver testified that the towers are built "so they overlap about 51 percent from one tower to the next, the coverage areas. So, [they] have that seamless transmission . . . . In Hartford, with the amount of cell towers we have, we generally expect to see industry standard. We've got—1.5 miles is the average coverage area." Weaver testified that cell phone calls are routed through the tower that the phone is closest to and has the best signal from. According to Weaver, however, a cell phone would not necessarily have to be within a tower's coverage area to be routed through that tower. He explained that, although towers should not overlap too much, because otherwise there would be interference that would cause dropped calls, there remains some overlap so that, "if you're a little bit farther out [from the coverage area], you [may] still connect with that tower. There might be a better line of sight, or you might have a building in the way and that tower is the best tower as opposed to the one that might be closer to you." Weaver clarified that the cell phone data and subsequent map show only that "the phone itself was in a certain area" but do not establish that a certain person was in a certain area or provide a specific address at which the phone was located.

The maps Weaver generated in this case have an underlying map of the city of Hartford. There are orange pie shaped sections showing the coverage area of the side of the particular tower that the call data records show a particular call was routed through. The maps also identify locations or addresses important to the investigation of the crime at issue. Weaver explained that "[w]hat we do, once we have the towers associated on the map, the program, we add in the data that [come] from the cell phone company about the calls that were

made. So, we know at . . . 3:24 in the afternoon, that . . . the cell phone [at issue] made a call, and it was routed through that pie shaped area. What we do is, the next call is routed through another tower, or it can be the same tower, in which case, you wouldn't show movement [on the map]. So, the—the—the movement is actually just shown of where the cell phone goes over time. So, we move it from the center of one coverage area to the center of the next coverage area. I can't tell you which streets were driven down. The—the only thing we can be 100 percent sure of is, the phone calls were made and that at some point the cell phone traveled between—from one coverage area to the next coverage area."

The maps showed that, at 3:25 p.m. on the day of the shooting, the cell phone that the defendant dropped was in a particular cell coverage area, in which was 1154 Albany Avenue, the address for the pawn shop where the victim's gold chain and medallion were sold. At 3:53 p.m., near the time of the murder, the cell phone was located within another coverage area, near 18 Flatbush Avenue, the location of the crime scene. Although the crime scene was located just outside of the coverage area of the tower that routed the 3:53 p.m. call, as explained, Weaver testified that a cell phone may be located outside of a tower's coverage area but be routed through that tower if that tower had the better signal. Then, at approximately 4:17 p.m., the maps showed the cell phone again within the cell coverage area that included the location of the pawn shop.

In closing argument, the state relied on the cell coverage maps to establish that the defendant was present in the area of the crime scene at the time of the crime and subsequently was present in the area of the pawn shop sometime after the crime occurred. The jury subsequently found the defendant guilty of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2), but found him not guilty of murder. The trial court thereafter rendered judgment in accordance with the jury's verdict and sentenced the defendant to a total effective term of seventy years of incarceration, thirty of which are a mandatory minimum sentence.

The defendant appealed to this court, and the appeal was transferred to the Appellate Court pursuant to Practice Book 65-1. On appeal to the Appellate Court, the defendant claimed, inter alia, that the trial court improperly admitted documentary and testimonial evidence regarding cell phone coverage maps in violation of his federal due process right to a fair trial. The Appellate Court held that the defendant's claim was unpreserved and unreviewable under *Golding* because it was eviden-

tiary, not constitutional, in nature. *State* v. *Turner*, supra, 181 Conn. App. 551. Additionally, the Appellate Court declined to review this claim under the plain error doctrine "because defense counsel assented to the admission of the cell phone evidence that the defendant now claims deprived him of his right to a fair trial, and, thereafter, used it in a manner indicating that the decision was made as a matter of trial tactics . . . ."[2] Id., 555. Finally, the Appellate Court declined to review this claim under its supervisory authority over the administration of justice, holding that the defendant had failed to present extraordinary circumstances warranting such an exercise. Id., 555 n.17. Thus, the Appellate Court affirmed the judgment of conviction.

The defendant then petitioned for certification to appeal, which we granted, limited to the following issues: (1) "Did the Appellate Court properly determine that the petitioner was not entitled to review, under *State* v. *Golding*, [supra, 213 Conn. 233], of his unpreserved claim that the trial court improperly admitted cell tower coverage maps?" And (2) "Did the Appellate Court properly determine that the petitioner was not entitled to plain error review of his unpreserved claim that the trial court improperly admitted cell tower coverage maps?" *State* v. *Turner*, 330 Conn. 909, 193 A.3d 48 (2018).

I

To address the defendant's claims properly, a review of recent changes in our case law pertaining to the admissibility of expert testimony regarding cell phone data is useful.

"In *Porter*, we followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that testimony based on scientific evidence should be subjected to a flexible test to determine the reliability of methods used to reach a particular conclusion. . . . A *Porter* analysis involves a two part inquiry that assesses the reliability and relevance of the witness' methods. . . . First, the party offering the expert testimony must show that the expert's methods for reaching his conclusion are reliable. . . . Second, the proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . . Put another way, the proponent of scientific evidence must establish that the specific scientific testimony at issue is, in fact, derived from and based [on] . . . [scientifically reliable] methodology."[3] (Internal quotation marks omitted.) *State* v. *Edwards*, supra, 325 Conn. 124. This second inquiry is known as the "fit" requirement. *Prentice* v. *Dalco Electric, Inc.*, 280 Conn. 336, 344, 907 A.2d 1204 (2006), cert. denied, 549 U.S. 1266, 127 S. Ct. 1494, 167 L. Ed. 2d 230 (2007).

"[F]or the trial court, in the performance of its role as the gatekeeper for scientific evidence, properly to assess the threshold admissibility of scientific evidence, the proponent of the evidence must provide a sufficient articulation of the methodology underlying the scientific evidence. Without such an articulation, the trial court is entirely ill-equipped to determine if the scientific evidence is reliable upon consideration of the various *Porter* factors. Furthermore, without a clear understanding as to the methodology and its workings, the trial court also cannot properly undertake its analysis under the fit requirement of *Porter*, ensuring that the proffered scientific evidence, in fact, is based upon the reliable methodology articulated." (Internal quotation marks omitted.) *State* v. *Edwards*, supra, 325 Conn. 125. Although it is the proponent's burden to satisfy the *Porter* requirements, the party opposing the admission of the expert testimony must object and request a *Porter* hearing, otherwise, any objection is waived. *Weaver* v. *McKnight*, 313 Conn. 393, 415–16, 97 A.3d 920 (2014).

Before the proponent proceeds to satisfy the *Porter* requirements, however, a court must initially determine whether the evidence at issue is the type of scientific evidence contemplated by *Porter*. See, e.g., *Arthur* v. *Commissioner of Correction*, 162 Conn. App. 606, 621–22, 131 A.3d 1267, cert. denied, 323 Conn. 915, 149 A.3d 496 (2016). At the time of the defendant's trial in the present case, this court had not been asked to decide whether cell phone data constituted the type of scientific evidence contemplated by *Porter*. The Appellate Court, however, in *Arthur*, considered this issue when the petitioner alleged a claim for "ineffective assistance of counsel because [his counsel had] failed to request a *Porter* hearing regarding the cell phone evidence offered by the state to show the petitioner's movements on the night of the shooting." Id., 619. The Appellate Court noted that requests for *Porter* hearings regarding this kind of expert testimony were routinely denied in this state and "that numerous courts across the country have concluded that such evidence is sufficiently well established that a hearing concerning its scientific reliability is unnecessary . . . ." Id., 623 n.6. The Appellate Court concluded that the petitioner had failed to establish that cell phone data was the kind of scientific evidence contemplated by *Porter* and, thus, "[had] failed to show that he was prejudiced by [his counsel's] failure to request a *Porter* hearing . . . ." Id., 623.

After the defendant's trial in the present case, but while his appeal was pending before the Appellate Court, this court released its decision in *State* v. *Edwards*, supra, 325 Conn. 97. In *Edwards*, the state offered the testimony of Detective Christopher Morris of the Wethersfield Police Department regarding cell phone data and maps he generated therefrom. Id., 118–

19, 121. The defendant objected to the admission of the maps and requested a *Porter* hearing, which the trial court denied. Id., 118, 123.[4] On appeal in *Edwards*, the defendant argued to this court that the trial court improperly had failed to qualify Morris as an expert and denied his request for a *Porter* hearing. We agreed. Id., 118. Specifically, we concluded that Morris should have been qualified as an expert witness before the court allowed him to testify regarding cell phone data because of his superior knowledge on this subject. Id., 128, 133. Additionally, we determined that expert testimony regarding cell phone data is the type of scientific evidence contemplated by *Porter*, and, thus, a *Porter* hearing was required to ensure that his testimony was based on reliable scientific methodology. Id., 129–33. Nevertheless, we applied an evidentiary harmless error analysis, concluding that these errors had not harmed the defendant. Id., 133–34.

## II

The defendant first claims that the Appellate Court incorrectly determined he was not entitled to *Golding* review of his unpreserved claim that the trial court violated his right to a fair trial by admitting Weaver's testimony and cell tower coverage maps without conducting a *Porter* hearing. More specifically, he argues that (1) the admission of Weaver's testimony and cell tower coverage maps without a *Porter* hearing violated the new rule announced in *Edwards*, and (2) Weaver's cell tower coverage maps did not satisfy the *Porter* "fit" prong because they were not derived from his stated methodology and were incapable of proving the proposition for which they were offered—that the defendant was at specific locations at specific times. The defendant acknowledges that the trial court's failure to conduct a *Porter* hearing and exclude the maps from evidence were, at best, unpreserved evidentiary errors. He nonetheless argues that the Appellate Court improperly failed to address his argument that these evidentiary errors were significant and crucial enough that they implicated his due process right to a fair trial and, thus, were constitutional in nature under *Golding*'s second prong. The state concedes that an evidentiary error may rise to the level of a constitutional violation but contends that the defendant failed to establish that the alleged evidentiary errors exist, let alone rise to that level. We agree with the state.

It is undisputed that the defendant did not preserve his claim at trial either by objecting to Weaver's testimony or to the admission of the cell tower coverage maps, or by requesting a *Porter* hearing. "[T]his court is not required to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial." (Internal quotation marks omitted.) *State* v. *Fay*, 326 Conn. 742, 766, 167 A.3d 897 (2017). "It is well established, however, that an unpreserved claim is review-

able under *Golding* when (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) Id. "In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." *State* v. *Golding*, supra, 213 Conn. 240.

Under the second prong of *Golding*, an unpreserved evidentiary error generally is not reviewable. See, e.g., *State* v. *Toccaline*, 258 Conn. 542, 550, 783 A.2d 450 (2001). Because "the admissibility of expert testimony is a matter of state evidentiary law . . . in the absence of timely objection, [it] does not warrant appellate review under [*Golding*] . . . because it does not, per se, raise a question of constitutional significance." *State* v. *Joyner*, 225 Conn. 450, 480, 625 A.2d 791 (1993). Thus, an unpreserved claim that the trial court improperly failed to conduct a *Porter* hearing, which involves the admissibility of expert testimony, generally is not reviewable. See *State* v. *Natal*, 113 Conn. App. 278, 285, 966 A.2d 331 (2009).

Nevertheless, this court has recognized that an unpreserved evidentiary claim may be constitutional in nature if "there is a resultant denial of fundamental fairness or the denial of a specific constitutional right . . . ." (Internal quotation marks omitted.) *State* v. *Toccaline*, supra, 258 Conn. 550; see also *State* v. *Crespo*, 303 Conn. 589, 609 n.15, 35 A.3d 243 (2012). This is consistent with federal jurisprudence, which recognizes that an evidentiary error may be of constitutional magnitude if "the error was so pervasive as to have denied [the defendant] a fundamentally fair trial . . . . [T]he standard . . . [is] whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been 'crucial, critical, [and] highly significant . . . .'" (Citations omitted.) *Collins* v. *Scully*, 755 F.2d 16, 18–19 (2d Cir. 1985); see also *McKinnon* v. *Superintendent, Great Meadow Correctional Facility*, 422 Fed. Appx. 69, 72 (2d Cir. 2011), cert. denied sub nom. *McKinnon* v. *LaValley*, 565 U.S. 1181, 132 S. Ct. 1151, 181 L. Ed. 2d 1024 (2012); *Smith* v. *Greiner*, 117 Fed. Appx. 779, 781 (2d Cir. 2004), cert. denied sub nom. *Smith* v. *Fischer*, 544 U.S. 984, 125 S. Ct. 1853, 161 L. Ed. 2d 741 (2005).

The "crucial, critical, [and] highly significant" stan-

dard—which elevates evidentiary error into constitutional error in some circumstances—has created some confusion as to which prong of *Golding* is implicated in the analysis: "This stems from confusion over the proper application of the second and third prongs. . . . [Because] any claim of evidentiary error . . . premised on a generalized violation of a party's due process right is constitutional in nature [only] if the harm resulting from the error is sufficient to require a new trial . . . [this kind of claim] will necessitate a review of the full record—in effect, the analysis required by *Golding*'s third prong—to determine whether the claim is indeed constitutional in nature in order to satisfy *Golding*'s second prong." (Emphasis omitted.) *State* v. *Crespo*, supra, 303 Conn. 609 n.15; see also id., 607–609 (describing how inconsistently these claims have been addressed). Moreover, to the extent this analysis is undermined by an inadequate record, *Golding*'s first prong likewise may be implicated. See *State* v. *Holley*, 327 Conn. 576, 598–601, 175 A.3d 514 (2018); *State* v. *Johnson*, 149 Conn. App. 816, 830–31, 89 A.3d 983, cert. denied, 312 Conn. 915, 93 A.3d 597 (2014). Thus, if the record is inadequate to determine whether an evidentiary error exists and is "crucial, critical, [and] highly significant," a defendant's constitutional claim will fail under the first, second, and third prongs of *Golding*.

In the present case, the defendant claims that the trial court improperly admitted the cell tower coverage maps, violating his due process right to a fair trial because the maps were crucial to the state's case. Specifically, he asserts two evidentiary errors in support of his argument that the trial court improperly admitted the cell tower maps. First, he argues that the trial court improperly failed to conduct a *Porter* hearing because this court's recent decision in *Edwards* required the court to do so. Second, he argues that, even without a *Porter* hearing, the trial court improperly admitted Weaver's cell tower coverage maps because it is clear from the record that the maps did not satisfy the *Porter* "fit" requirements that they be derived from the expert's stated methodology and that they prove the proposition for which they were offered—that the defendant was at specific locations at specific times.[5] He argues that the record is adequate to review the two alleged errors.

The state responds that, under *Edwards*, the defendant was required to request a *Porter* hearing, and, thus, the trial court need not have conducted such a hearing sua sponte. Accordingly, the state contends that the defendant's first alleged error fails under the second and third prongs of *Golding*. Additionally, because there was no *Porter* hearing, the state argues that the record is inadequate to determine whether the cell tower coverage maps would have satisfied the *Porter* "fit" prong. As a result, the state argues, the defendant's second alleged error fails under the first, second, and third prongs of *Golding* because he has failed to establish

an evidentiary error, let alone a "crucial, critical, [and] highly significant" error that implicated his due process right to a fair trial. We agree with the state.

As to the first alleged error, the defendant argues that, under the new rule announced by this court in *Edwards*, a trial court is required to conduct a *Porter* hearing to assess the reliability of the expert testimony regarding cell phone data and that this new rule applies retroactively to the present case. The defendant argues that the record in the present case is similar to the record in *Edwards*, in which this court held that the trial court improperly failed to hold a *Porter* hearing, even though there was no record regarding the expert's qualifications or methodology.

But, in fact, the record in *Edwards* was different from the record in the present case in one critical respect: the defendant in *Edwards* raised the claim to the trial court. In fact, the defendant in *Edwards*, on multiple occasions, specifically objected to the admission of the expert testimony and corresponding cell coverage maps, and requested that the trial court conduct a *Porter* hearing. *State* v. *Edwards*, supra, 325 Conn. 118–19. We held that the trial court's refusal to grant the request for a *Porter* hearing was error. Id., 133. Even though we agree with the Appellate Court that the rule in *Edwards* applies retroactively,[6] we did not hold in *Edwards* that trial courts were bound to have, sua sponte, held *Porter* hearings in every case involving expert testimony on cell phone data in the absence of an objection or request to do so.

Rather, a court is obligated to conduct a *Porter* hearing only when a party requests one. See, e.g., *Prentice* v. *Dalco Electric, Inc.*, supra, 280 Conn. 352 (trial court was obligated to hold *Porter* hearing once defendant objected to expert testimony and requested hearing); see also *State* v. *Sullivan*, 244 Conn. 640, 651 n.14, 712 A.2d 919 (1998) ("[w]e never have held that a trial court has an independent obligation to order, sua sponte, a hearing on an evidentiary matter, in the absence of both a request for a hearing and an adequate offer of proof").

This is consistent with this court's previously stated rule that parties waive their right to a *Porter* hearing if no request is made. See *Weaver* v. *McKnight*, supra, 313 Conn. 415–16 ("To raise a *Porter* claim, the party opposing the admission of the scientific evidence must first object to the validity of the expert's methods. . . . The failure to raise a *Porter* claim in the trial court results in waiver of that claim and it will not be considered for the first time on appeal." (Citations omitted.)). In the absence of a request for a *Porter* hearing, the proponent of the expert testimony is deprived of the opportunity to present evidence supporting the expert's methodology, hindering the court's ability to determine whether the expert testimony in fact satisfies the *Porter* requirements. Id., 416. Federal courts that have consid-

ered the issue consistently have held that United States District Courts are obligated to conduct a *Daubert* hearing only when one has been requested but do not have an obligation to conduct one sua sponte. See *United States* v. *Bedford*, 628 F.3d 1232, 1236 (10th Cir. 2010) ("trial court was not obligated to act sua sponte [to conduct a *Daubert* hearing] without an objection from [defense counsel]"); *Hoult* v. *Hoult*, 57 F.3d 1, 4–5 (1st Cir. 1995) ("[w]e do not think, however, that district courts are required, sua sponte, to make explicit [on the record] rulings regarding the admissibility of expert testimony" under *Daubert*); see also *Henry* v. *St. Croix Alumina, LLC*, 572 Fed. Appx. 114, 119 (3d Cir. 2014) ("District Court . . . acted within its discretion in declining to hold a *Daubert* hearing sua sponte"); *Gamboa* v. *Henderson*, Docket No. 99-20965, 2000 WL 1835289,*2 (5th Cir. November 29, 2000) ("[a] *Daubert* analysis of the admissibility of expert testimony . . . does not lend itself to instant, sua sponte rulings from the bench").

Thus, even though the new rule in *Edwards* applies retroactively, its retroactive application to pending cases does not compel the conclusion that a trial court is required to conduct a *Porter* hearing sua sponte in the absence of a request for one. Retroactivity of new, nonconstitutional evidentiary rules does not relieve a defendant of his obligation to preserve the claim. In other cases in which a new, nonconstitutional evidentiary rule has been applied retroactively, the defendant still was required to preserve his claim at trial in order to be entitled to review. See *State* v. *Martinez*, 95 Conn. App. 162, 166 n.3, 896 A.2d 109 (2006) (concluding that, even if new jury instruction rule announced in *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 (2005), which was not of constitutional dimension, was retroactive, court would decline to review defendant's unpreserved evidentiary claim that trial court failed to give jury instruction regarding credibility of jailhouse informants because defendant did not raise claim during trial), cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006); cf. *State* v. *Steele*, 176 Conn. App. 1, 24, 27, 31, 169 A.3d 797 (2017) (applying rule in *Edwards* retroactively when defendant preserved claim that court improperly permitted lay testimony concerning historic cell site analysis where defendant had objected), cert. denied, 327 Conn. 962, 172 A.3d 1261 (2017); *State* v. *Quinones*, 56 Conn. App. 529, 533, 745 A.2d 191 (2000) (applying new rule retroactively where preservation was not at issue).

Thus, we conclude that our holding in *Edwards* did not obligate the trial court in the present case to hold a *Porter* hearing sua sponte. In the absence of error, the defendant has not established that the trial court's failure to hold a *Porter* hearing was constitutional in nature or violated his constitutional rights under the second and third prongs of *Golding*.

The defendant contends that we should overlook his failure to request a *Porter* hearing because, before *Edwards*, requests for *Porter* hearings regarding cell tower data routinely had been denied, so there was no reason to believe that the trial court would have granted his request had he made one. His failure to request a *Porter* hearing, he claims, should not result in a different outcome than in *Edwards* itself. The defendant appears to be making a fairness argument—that, because this court's decision in *Edwards* had not been released at the time of his trial, it is unfair to place the burden of requesting a *Porter* hearing on him because he did not know that he could do so. We are not persuaded.

Like the defendant in *Edwards*, who also did not have the benefit of our decision in that case, the defendant in the present case could have objected to the admission of the cell data evidence and requested a *Porter* hearing, but he did not do so. Because the defendant did not request a *Porter* hearing, the record is bereft of what the trial court would have done if he had. We will not find facts not in the record or presume evidentiary error on the part of the trial court when it was never asked to decide this issue.[7]

The defendant next argues that the trial court improperly admitted the cell tower coverage maps because, even without a *Porter* hearing, it is clear on the record that the maps did not satisfy the *Porter* "fit" requirement.[8] Specifically, he argues that the maps were not derived from Weaver's stated methodology.[9] Additionally, the defendant argues that the maps were incapable of proving the proposition for which they were offered—that the defendant was at specific locations at specific times—because Weaver's testimony extensively qualified the maps' ability to prove the defendant's location, clarifying that the maps showed only the general area where the phone was located, not the specific address where the defendant was located.

As this court previously has explained, however, without the defendant's having objected to Weaver's testimony and requested a *Porter* hearing, it is impossible to determine whether the state would have been able to satisfy the "fit" requirements of *Porter* or whether the admission of the maps was more prejudicial than probative. See *Weaver* v. *McKnight*, supra, 313 Conn. 416. Even if we assume that the state cannot satisfy the "fit" requirement on the current record in this case, we have no way of knowing whether the state would have presented additional evidence to support Weaver's methodology and to show that the cell tower coverage maps were derived from this methodology if the defendant had requested a *Porter* hearing.

The defendant contends that the state would not have been able to present any additional evidence to explain away the maps' failure to show the adjacent cell sites,

but this is merely speculation in light of the fact that Weaver never was asked why he did not incorporate these adjacent cell towers into his maps and whether this was consistent with the methodology he employed. Perhaps Weaver would have provided greater detail about the methodology he employed that would have explained why it was unnecessary to incorporate the adjacent cell towers into the maps: "[W]ithout a clear understanding as to the methodology and its workings, the trial court . . . cannot properly undertake its analysis under the fit requirement of *Porter*, ensuring that the proffered scientific evidence, in fact, is based upon the reliable methodology articulated." (Internal quotation marks omitted.) *State* v. *Edwards*, supra, 325 Conn. 125. Neither can we. As a result, the record is inadequate to determine whether Weaver's cell tower coverage maps satisfy the *Porter* "fit" requirement.

The defendant has failed to establish that the trial court erred in admitting Weaver's cell tower coverage maps and that this error was crucial, critical, and highly significant such that it implicated his due process right to a fair trial. Accordingly, the defendant's claim fails under *Golding*.

III

The defendant next claims that, even if he is not entitled to *Golding* review of his unpreserved claim, he is entitled to reversal of his conviction because the trial court's failure to conduct a *Porter* hearing constituted plain error. Specifically, he asks this court to adopt the federal plain error standard, which requires a determination of whether an error was clear on the basis of the law existing at the time of appeal, not the time of trial. See, e.g., *Henderson* v. *United States*, 568 U.S. 266, 269, 133 S. Ct. 1121, 185 L. Ed. 2d 85 (2013) (addressing temporal aspect of rule 52 (b) of the Federal Rules of Criminal Procedure and holding that, "as long as the error was plain as of . . . the time of appellate review," "the error is 'plain' within the meaning of the [r]ule"). The defendant argues that, under the federal plain error standard, by the time of his appeal before the Appellate Court, it was clear under *Edwards* that admitting the cell tower coverage maps without first conducting a *Porter* hearing was error.[10] We decline to adopt the federal standard.

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . so obvious that it [is not debatable and] affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [Additionally, a] party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . [Thus, an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that

the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . . It is axiomatic that . . . [t]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *McClain*, 324 Conn. 802, 812–14, 155 A.3d 209 (2017).

This court has explained that whether an error is clear is premised on the law existing at the time of trial. See *State* v. *Darryl W.*, 303 Conn. 353, 374, 33 A.3d 239 (2012) ("[i]t is axiomatic that the trial court's proper application of the law existing at the time of trial cannot constitute reversible error under the plain error doctrine" (internal quotation marks omitted)); *State* v. *Diaz*, 302 Conn. 93, 104 n.8, 25 A.3d 594 (2011) (same); see also *State* v. *Bellamy*, 323 Conn. 400, 458 n.6, 147 A.3d 655 (2016) (*Rogers*, *C. J.*, concurring) ("[i]t is axiomatic that the trial court's proper application of the law existing at the time of trial cannot constitute reversible error under the plain error doctrine" (internal quotation marks omitted)). The defendant, nevertheless, urges this court to adopt the federal plain error standard, in which clear error is assessed on the basis of the law existing at the time of appeal. See, e.g., *Henderson* v. *United States*, supra, 568 U.S. 271 ("[T]he general rule . . . is that an appellate court must apply the law in effect at the time it renders its decision. . . . This principle favors assessing plainness at the time of review." (Citations omitted; internal quotation marks omitted.)); *United States* v. *Bruno*, 383 F.3d 65, 79 (2d Cir. 2004) ("[a]n error is 'plain' if it is 'clear' or 'obvious' at the time of appellate consideration (emphasis omitted)).

This court has declined to adopt the federal plain error rule, however, concluding that federal case law is "inapposite and unpersuasive" in determining the scope of plain error review. *State* v. *McClain*, supra, 324 Conn. 813 n.8. This is because of the "fundamental differences" between federal and state law regarding the plain error doctrine. Id. "Under federal law, an appellate court may, *in its discretion*, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." (Emphasis in original; internal quotation marks omitted.) Id. Thus, clear error is just one aspect of the federal plain error doctrine, even if measured as of the time of the appeal. "By contrast . . . Connecticut's plain error doctrine is a rule of reversibility, *mandating reversal* when plain error is found." (Emphasis added.) Id.; see also *State* v. *Bellamy*, supra, 323 Conn. 435–39 (explaining differ-

ences between federal and Connecticut plain error doctrines). Unlike federal courts, Connecticut appellate courts do not have discretion to reverse a conviction for plain error, and the defendant does not ask this court to grant appellate courts this discretion.

In light of this distinction between the federal plain error doctrine and Connecticut's plain error doctrine, we continue to decline to adopt the federal plain error standard and, thus, decline to extend our plain error doctrine to errors that were not clear at the time of trial and require reversal in cases in which both the trial court and the parties properly applied the law existing at the time of trial.[11] Accordingly, because this court had not issued its decision in *Edwards* at the time of the defendant's trial and the existing case law at the time of trial did not guarantee the defendant the right to a *Porter* hearing regarding cell phone data, we cannot conclude that the plain error doctrine applies to provide the defendant any relief.[12]

## IV

Finally, the defendant requests that this court exercise its supervisory authority over the administration of justice to review his unpreserved claim that the trial court improperly admitted Weaver's testimony and corresponding cell tower coverage maps without conducting a *Porter* hearing.[13] The defendant argues that this is an exceptional case in which the interests of justice and consistency of the law weigh in favor of this court's exercising its supervisory authority, because, otherwise this court's new rule in *Edwards* will be inconsistently applied. We are not persuaded.

"[B]ypass doctrines permitting the review of unpreserved claims such as [*Golding*] . . . and plain error [claims], are generally adequate to protect the rights of the defendant and the integrity of the judicial system . . . . [T]he supervisory authority of this state's appellate courts is not intended to serve as a bypass to the bypass, permitting the review of unpreserved claims of case specific error—constitutional or not—that are not otherwise amenable to relief under *Golding* or the plain error doctrine. . . . Consistent with this general principle, we will reverse a conviction under our supervisory powers only in the rare case [in which] fairness and justice demand it. . . . [The issue at hand must be] of [the] utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Citations omitted; internal quotation marks omitted.) *State* v. *Reyes*, 325 Conn. 815, 822–23, 160 A.3d 323 (2017).

The present case does not present the exceptional and unique circumstances that would justify this court's exercising its supervisory authority. Without an adequate record to determine that an evidentiary error exists, let alone was harmful, we are not inclined to

reverse the defendant's conviction. Additionally, we are not persuaded by the defendant's argument that the consistent application of *Edwards* compels this court to exercise its supervisory authority. As explained in part I of this opinion, *Edwards* entitles a defendant to a *Porter* hearing regarding cell phone data only upon request. *Edwards* does not obligate a trial court to conduct a *Porter* hearing sua sponte. Because the defendant in the present case did not request a *Porter* hearing, our decision not to exercise our supervisory authority is entirely consistent with our holding in *Edwards*—only defendants who request a *Porter* hearing are entitled to one.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] Subsequently, when approached by the police, the defendant identified himself as Aaron Patrick and presented fake identification under that same alias. *State* v. *Turner*, supra, 181 Conn. App. 543.

[2] Specifically, the Appellate Court relied on the fact that, "[d]uring defense counsel's closing argument, he relied on portions of Weaver's testimony" to establish that the cell phone data and Weaver's testimony could not establish who was in possession of the phone and where precisely the phone was located at any specific point in time. *State* v. *Turner*, supra, 181 Conn. App. 554–55.

[3] Not all scientific evidence, however, must satisfy the two-pronged *Porter* test in order to be admissible. See, e.g., *State* v. *Reid*, 254 Conn. 540, 546–47, 757 A.2d 482 (2000); see also Conn. Code Evid. § 7-2, commentary (explaining that *Porter* does not apply if scientific principles are well established or if evidence is presented in manner that does not supplant jury's judgment).

[4] The trial court did not label Morris as an expert, "just somebody with superior knowledge." *State* v. *Edwards*, supra, 325 Conn. 126. In *Edwards*, this court did not address whether the trial court improperly permitted lay testimony concerning cell phone data because the defendant did not raise this claim. Similarly, in the present case, Weaver was not disclosed as an expert witness by the state, although the trial court later classified him as an expert. The defendant, however, does not claim that the trial court's improper admission of lay testimony regarding cell phone data violated his right to a fair trial, and, thus, we do not address that issue.

[5] The defendant concedes that he does not argue that the maps were improperly admitted because Weaver's methodology was unreliable under the first prong of *Porter*, acknowledging that the record is inadequate to review the reliability of his methodology in the absence of a *Porter* hearing.

Also, in a single sentence in his brief before this court, the defendant suggests a third evidentiary error: "[T]he record establishes error under *Edwards* because . . . Weaver was not qualified as an expert on the scientific methodology used to predict a cell phone's location in relation to the cell tower it connects with." The defendant, however, has provided no analysis in support of this argument to establish that Weaver was unqualified as an expert. Moreover, in his reply brief, the defendant explicitly limited his argument to two alleged errors: (1) admission of the cell tower coverage maps without a *Porter* hearing in violation of the new rule announced in *Edwards*, and (2) the maps' failure to satisfy the *Porter* "fit" requirement. The defendant, thus, does not argue that the trial court's failure to qualify Weaver as an expert was constitutional in nature. Accordingly, we do not address this argument.

[6] The Appellate Court in the present case stated in a footnote that the rule in *Edwards* applied retroactively, relying on *State* v. *Elias G.*, 302 Conn. 39, 45, 23 A.3d 718 (2011) ("'a rule enunciated in a case presumptively applies retroactively to pending cases'"). See *State* v. *Turner*, supra, 181 Conn. App. 549 n.13.

This court has established "the general rule that judgments that are not by their terms limited to prospective application are presumed to apply retroactively . . . to cases that are pending . . . ." (Internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 457, 988 A.2d 167 (2009). We have clarified, however, that "[c]omplete retroactive effect is most appropriate" in cases that announce a new constitutional rule or a new judicial

interpretation of a criminal statute. (Internal quotation marks omitted.) *State* v. *Ryerson*, 201 Conn. 333, 339, 514 A.2d 337 (1986) ("[c]omplete retroactive effect is most appropriate where a new constitutional principle is designed to enhance the accuracy of criminal trials" (internal quotation marks omitted)); see *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 764, 12 A.3d 817 (2011) (full retroactivity for new judicial interpretation of criminal statute); see also *State* v. *Elias G.*, supra, 302 Conn. 45–46 (applying new interpretative gloss retroactively on statute providing for transfer of cases from juvenile docket to regular criminal docket where gloss was required for due process purposes).

[7] Also, we cannot rule out the possibility that the defendant's failure to object to Weaver's testimony or evidence could have been tactical, especially in light of the defendant's extensive cross-examination of Weaver and summation argument focusing on Weaver's inability to definitively state where precisely the defendant was located at particular times.

[8] The defendant alternatively contends that, to the extent the maps minimally satisfy the *Porter* "fit" requirement, the probative value of their admission is outweighed by its prejudicial effect.

[9] The defendant argues that Weaver testified about the industry standards—a 1.5 mile estimated coverage area in Hartford and 51 percent tower overlap—but there was no evidence presented that Weaver employed these standards in creating the maps because he did not include the competing signals of adjacent cell tower sites in his maps. He contends that this enabled Weaver to easily manipulate the maps to produce the desired result. For example, the maps depict the defendant's cell phone location in a coverage area near to the scene of the crime, but the maps do not depict that the scene of the crime was located in a different tower's coverage area that the call was not routed through.

[10] Additionally, the defendant argues that the Appellate Court incorrectly determined that he was not entitled to review of his claim under the plain error doctrine on the ground that he had strategically decided not to object to Weaver's testimony and the admission of the cell tower coverage maps. Because we determine that the defendant is not entitled to reversal of his conviction under the plain error doctrine on the ground that he has failed to establish clear error, we do not reach this issue.

[11] In support of his argument that this court should reverse his conviction on the basis of our decision in *Edwards*, the defendant cites to out-of-state cases in which the reviewing court found plain error on the basis of the law at the time of the appeal. All of these cases, however, have adopted plain error standards similar to the federal standard, which we do not. See *Madison* v. *State*, 620 So. 2d 62, 73 (Ala. Crim. App. 1992); *State* v. *Green*, 447 N.J. Super. 317, 324–29, 147 A.3d 876 (App. Div. 2016), overruled in part on other grounds by *State* v. *Covil*, Docket No. 081267, 2020 WL 355592, *12–13 (N.J. January 22, 2020); *State* v. *Wells*, 257 Or. App. 808, 811–14, 308 P.3d 274 (2013).

[12] Even if we applied the law existing at the time of appeal, the defendant still has failed to establish that he is entitled to reversal of his conviction under the plain error doctrine because, for the same reasons explained in part I of this opinion, the record is inadequate to determine whether error in fact occurred. See, e.g., *State* v. *McClain*, supra, 324 Conn. 812 ("a complete record and an obvious error are prerequisites for plain error review" (internal quotation marks omitted)). Additionally, because the trial court was not required to conduct a *Porter* hearing sua sponte; see part I of this opinion; this is not the kind of case that justifies reversal under the plain error doctrine in light of the defendant's failure to object to the admission of the cell tower coverage maps and to request a *Porter* hearing. See *State* v. *Natal*, supra, 113 Conn. App. 285–86 (unpreserved *Porter* claim was not kind of claim that justifies plain error review); see also *State* v. *Brett B.*, 186 Conn. App. 563, 602–606, 200 A.3d 706 (2018) (same), cert. denied, 330 Conn. 961, 199 A.3d 560 (2019); *State* v. *Wynne*, 182 Conn. App. 706, 720, 190 A.3d 955 (same), cert. denied, 330 Conn. 911, 193 A.3d 50 (2018).

[13] Additionally, in his reply brief, the defendant requests that this court exercise its supervisory authority to review his claim of instructional error that was decided against him by the Appellate Court. Although the defendant requested review of the Appellate Court's decision on this claim in his petition for certification for appeal to this court, we did not grant certification with respect to that issue. The defendant may present only those issues for which certification has been granted. See Practice Book § 84-9; see also *Taylor* v. *Commissioner of Correction*, 324 Conn. 631, 653–54, 153 A.3d 1264 (2017). Accordingly, we decline to consider this claim in the present appeal.