******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* RAASHON JACKSON
## (SC 20193)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins and Ecker, Js.

*Syllabus*

Convicted of murder, conspiracy to commit murder, and four counts of assault in the first degree in connection with a shooting in which one person died and four others were injured, the defendant appealed, challenging various evidentiary rulings and the trial court's decision to deny a motion for a continuance to allow him to retain an expert to respond to the testimony of W, whom the state belatedly disclosed to the defense and called as an expert witness on cell site location information. On the day of the shooting, the defendant and his friend, R, were driven by R's cousin to and from a housing complex where the shooting occurred. Approximately five to six months before his trial, the defendant filed a motion seeking disclosure of the expert witnesses the state intended to call and the opinions to which each witness was expected to testify. At a hearing on that motion approximately one week later, the court ordered the state to disclose to the defense any expert that it may ultimately select to testify about the proximity of the defendant's cell phone to a particular cell tower. Approximately three months later, the state provided the defense with a list of potential witnesses, including W, but did not identify him as an expert witness or describe the intended nature of his testimony. Approximately two months later, after voir dire commenced and seven days before evidence was to begin, the state provided the defense with W's resume and a copy of a certain computer software presentation that W had prepared and that purportedly charted the locations of the defendant's and R's cell phones around the time of the shooting. Thereafter, one day before evidence commenced, the defendant filed a motion in limine, seeking to preclude W's testimony. At the hearing on the defendant's motion, which the trial court conducted several days after evidence had begun, defense counsel requested that the court preclude W's testimony or, alternatively, grant a reasonable continuance of at least six weeks. The court denied the defendant's motion in limine insofar as he sought to exclude W's testimony, concluding, inter alia, that the defendant had not suffered prejudice as a result of the late disclosure. The court also denied counsel's request for a continuance. On appeal, the Appellate Court affirmed the judgment of conviction, concluding, inter alia, that the trial court had not abused its discretion in denying the motions in limine and for a continuance. On the granting of certification, the defendant appealed to this court, claiming that, contrary to the Appellate Court's conclusion, the trial court had abused its discretion in permitting W to testify in light of the state's late disclosure of W as an expert or, alternatively, in declining counsel's request for a continuance to obtain his own expert on cell site location information. *Held*:

1. The Appellate Court incorrectly concluded that the trial court had not abused its discretion when it allowed W to testify without first granting the defense a reasonable continuance so that it could retain its own expert witness on cell site location information, and, because the trial court's error was harmful, the defendant was entitled to a new trial: there was no valid reason why the disclosure of W was not made until after voir dire began and only one week before evidence was to begin, and the defendant was prejudiced by the late disclosure, as W's testimony included information that was beyond the knowledge of the average juror, it was essential for the defense to be able to retain its own expert in order to meaningfully understand and challenge W's testimony, and the two brief continuances that the trial court did afford the defense to obtain clarification from W regarding certain changes that W had made to his computer software presentation before he was to testify, did not meaningfully alleviate that prejudice; moreover, contrary to the state's claim, defense counsel did not abandon his request for a continuance by not renewing it after the state's direct examination of

W, as counsel noted numerous times after W's testimony that the defendant was prejudiced by the denial of counsel's request for a reasonable continuance, and counsel's statement that he was not seeking a further continuance was merely in response to the trial court's misunderstanding that the defense was seeking a continuance before proffering the testimony of its investigator on cell site location information; furthermore, the trial court's error of allowing W to testify without first giving the defense a reasonable continuance to obtain its own expert was harmful because, in view of the centrality of W's expert testimony to the state's case, which was the only objective evidence placing the defendant's cell phone in the same area as R's cell phone around the time of the shooting and the only evidence identifying the defendant as the second suspect in the shooting, this court could not conclude that it had a fair assurance that the error did not substantially affect the verdict.

2. This court declined to address the defendant's claims that the Appellate Court improperly upheld the trial court's exclusion of his investigator's testimony and that the Appellate Court incorrectly concluded that the defendant had failed to preserve his claim that the trial court was required to hold a hearing in accordance with *State* v. *Porter* (241 Conn. 57) before allowing W to testify because those claims were not sufficiently likely to arise during the defendant's retrial, and also declined to address the defendant's claim that the trial court abused its discretion by admitting evidence regarding his failure to appear in court on unrelated criminal charges as evidence of consciousness of guilt, as the record could look different on retrial.

Argued September 25, 2019—officially released March 3, 2020

*Procedural History*

Substitute information charging the defendant with four counts of the crime of assault in the first degree, and with one count each of the crimes of murder, conspiracy to commit murder, and criminal possession of a firearm, brought to the Superior Court in the judicial district of Fairfield, where the court, *Kavanewsky, J.*, granted the defendant's motion to sever the charge of criminal possession of a firearm; thereafter, the court granted the state's motion to consolidate for trial the defendant's case with that of another defendant, and the cases were tried to the jury; subsequently, the court denied in part the defendant's motion to preclude certain evidence and denied the defendant's motions for a continuance, for a mistrial, and to introduce certain evidence; verdict of guilty; thereafter, the court denied the defendant's motion for a judgment of acquittal or a new trial; subsequently, the state entered a nolle prosequi as to the charge of criminal possession of a firearm, and the court rendered judgment in accordance with the verdict, from which the defendant appealed to this court; thereafter, the case was transferred to the Appellate Court, *Lavine, Alvord* and *Beach, Js.*, which affirmed the judgment of the trial court, and the defendant, on the granting of certification, appealed to this court. *Reversed*; *new trial*.

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, *C. Robert Satti, Jr.*, supervisory assistant state's attorney, and *Pamela J. Esposito*, senior assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. The defendant, Raashon Jackson, appeals from the Appellate Court's judgment affirming his conviction of one count of murder in violation of General Statutes § 53a-54a (a), one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a), and four counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (5). See *State* v. *Jackson*, 183 Conn. App. 623, 627, 193 A.3d 585 (2018). The defendant claims, among other things, that it was an abuse of discretion for the trial court to permit the state's expert witness on cell site location information (CSLI) to testify as to what that information revealed about the location of the defendant and his associates during the time the crimes occurred because the state disclosed the expert after voir dire began and only one week before evidence started, despite a court order issued six months earlier requiring the state to disclose any experts. Alternatively, the defendant argues that it was an abuse of discretion for the trial court to deny his related motion for a continuance to obtain his own CSLI expert. We conclude that it was an abuse of discretion for the trial court to allow the state's late disclosed expert witness to testify without first granting the defendant a reasonable continuance to obtain his own expert. Because we also conclude that this error was harmful, we reverse the judgment of the Appellate Court.

The Appellate Court's opinion sets forth the facts that the jury could reasonably have found; see id., 627–29; which we summarize in relevant part as follows. On September 10, 2013, Roderick Rogers called his cousin, David Anderson, for a ride from Rogers' home in Bridgeport. Before Anderson arrived, a social worker, William Muniz, came to Rogers' house at 2:10 p.m. to discuss a job opportunity. Rogers informed Muniz that he had to leave but would be back in one hour. As Muniz was leaving, Anderson arrived. Because Anderson was on probation, he wore a global positioning system (GPS) device that tracked his movements.

Anderson and Rogers left the house in Anderson's car, and Rogers directed Anderson to drive toward Palisade Avenue, on the east side of Bridgeport. On Palisade Avenue, Rogers saw the defendant, a friend whom he called Red Dreads, and directed Anderson to stop the car. The defendant got into the backseat of Anderson's car. Rogers then directed Anderson to drive to the "Terrace," a reference to the Beardsley Terrace housing complex located in the north end of Bridgeport. After arriving at the housing complex, Rogers told Anderson to park on a side street off Reservoir Avenue. Rogers asked Anderson if he had an extra shirt, and Anderson told him to check the trunk. Rogers asked Anderson to wait because he and the defendant would be right back. Rogers and the defendant got out of the car, went

to the open trunk, shut the trunk, and walked down a hill.

At that time, a group of young men was gathered outside the housing complex. Rogers and the defendant approached the group, remarked, "y'all just came through the Ave shooting Braz, you all f'ed up," and either Rogers or the defendant began shooting at the group. One of the shooting victims, LaChristopher Pettway, sustained a fatal gunshot wound to his back. Four other victims, Tamar Hamilton, Leroy Shaw, Jauwane Edwards, and Aijahlon Tisdale, sustained nonfatal wounds.

Rogers and the defendant then left the scene of the shootings and returned to Anderson's car. Rogers told Anderson to drive down Reservoir Avenue. Anderson then drove to the corner of Stratford Avenue and Hollister Avenue, where Anderson parked the car on the side of the street. The defendant got out of the car, and Anderson drove Rogers home. Rogers called Muniz at 2:46 p.m., and Muniz returned to Rogers' home by 3 p.m.

The record reveals the following procedural history. On September 16, 2013, Rogers was arrested. That same day, Rogers sent the defendant a text message stating that "[d]ey taken [me]." Thereafter, the defendant also was arrested and charged in the operative information with murder, conspiracy to commit murder, and four counts of assault in the first degree.[1] The trial court granted the state's motion to consolidate for trial the defendant's case with Rogers' case.

Anderson testified as a witness for the state. Over defense counsel's objection, the state also presented the testimony of the state's CSLI expert, Sergeant Andrew Weaver of the Hartford Police Department, who testified to the location of Rogers' and the defendant's cell phones and Anderson's GPS monitor. The court also took judicial notice, over the defendant's objection, of facts surrounding the defendant's failure to appear in court, on unrelated charges, following the shootings as evidence of consciousness of guilt in this case.

The jury found the defendant guilty of all counts,[2] and he was sentenced to a total effective term of fifty-five years of incarceration. He appealed from the trial court's judgment, challenging various evidentiary rulings and the trial court's decision to deny his motion for a continuance to allow him to obtain an expert to respond to the state's belatedly disclosed expert. The Appellate Court rejected each of the defendant's arguments and affirmed the judgment of conviction. See *State* v. *Jackson*, supra, 183 Conn. App. 669.

We thereafter granted the defendant's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court properly hold that the trial court's denial of the motion to preclude the state's late disclosed expert witness [on CSLI] and related motion

for continuance was not an abuse of discretion and, even if an abuse of discretion, was not harmful error?" (2) "Did the Appellate Court properly [uphold] the trial court's exclusion of [testimony from the defendant's investigator on the issue of the defendant's cell phone location]?" (3) "Did the Appellate Court properly conclude that the trial court did not abuse its discretion by admitting evidence regarding the defendant's failure to appear in court on unrelated criminal charges as evidence of consciousness of guilt in this case?" And (4) "Did the Appellate Court properly conclude that the defendant had failed to preserve his claim that, pursuant to *State* v. *Edwards*, 325 Conn. 97, 156 A.3d 506 (2017), the trial court was required to hold a hearing in accordance with *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) [cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998)], before allowing the state's expert to give expert testimony regarding the defendant's cell phone location?" *State* v. *Jackson*, 330 Conn. 922, 922–23, 193 A.3d 1214 (2018). We conclude that it was an abuse of discretion for the trial court to allow the state's late disclosed expert witness to testify without first granting the defendant a reasonable continuance to obtain his own expert. We also conclude that this error was harmful. In light of this conclusion, we do not reach the remaining, certified issues.

I

We begin with the defendant's claim that the Appellate Court incorrectly concluded that the trial court did not abuse its discretion either when it allowed the state's late disclosed expert witness to testify or when it declined to grant the defendant a continuance to obtain his own expert witness.

The record reveals the following additional facts relevant to this issue. In April, 2014, the defendant served on the state a request for disclosure, which included a request for reports or statements of any experts. In response, the state disclosed certain information but did not include any information pertaining to an expert. One year later, the defendant filed a motion, dated April 21, 2015, seeking disclosure of the expert witnesses the state intended to call at trial and the opinions to which each witness was expected to testify. At an April 29 pretrial hearing on the motion, defense counsel specifically stated that it was unclear whether the state had obtained a CSLI expert and, if so, what that expert's opinion might be with respect to the defendant's cell phone location. The defendant indicated that, depending what the opinion was, he "would anticipate that [he] may file a motion in limine to . . . preclude entirely or to limit the scope of the testimony . . . ." The court confirmed that, "what you're asking for is, if the state's going to call an expert to give opinion evidence about the proximity of [the defendant's] cell phone or a tower somewhere that you [would] like to

know who that is and [what] they're going to say?" The defendant confirmed that this was the information he sought. The state raised no objection to this second disclosure request but stated that it "can't definitively say who that might be at this time because [it is] still analyzing the data . . . ." The court responded: "But . . . if you select somebody and they say, look, in my opinion, this cell phone was within, like, 100 feet of this tower . . . which is on this building, you'll disclose that to the defense?" The state replied that it would do so.

More than three months later, when jury selection began on August 3, 2015, the state provided the defendant with a list of 128 potential witnesses. The thirty-sixth name on the list was Weaver, under the heading "Hartford Police [Department]." Weaver was not identified as an expert witness or described in any other way. On October 1—nearly two months after that general disclosure, after voir dire had commenced, and seven days before evidence began—the state provided the defendant with Weaver's resume and a copy of a PowerPoint computer software presentation Weaver had prepared that purportedly charted the locations of the cell phones associated with the defendant and Rogers, as well as the GPS unit worn by Anderson around the time of the shootings.

On October 7, 2015, one day before evidence commenced, the defendant filed a motion in limine seeking to preclude Weaver's testimony, "particularly as it concerns [CSLI], or, at a minimum, a reasonable continuance in order that a defense expert may be retained (e.g., apply for and obtain funding authorization from the Office of the Chief Public Defender, allow for [the] expert's review of necessary materials, etc.)." The defendant argued that the state had not provided him foundational information for Weaver's opinion and that the late disclosure unduly prejudiced him and his right to present a defense. The defendant noted that, because Weaver's name had been among those that the state had read to venire panels since the start of jury selection, nearly two months prior, "the state knew for *at least* two months that it intended to call [Weaver] for purposes of offering his PowerPoint presentation but waited until the literal eve of trial to disclose it to the defense, a course that deprived [the defendant] of the opportunity to inquire about the potential impact of cell phone data on [a venireperson's] decision-making and/or to ascertain [a venireperson's] familiarity with cell phone data and towers." (Emphasis in original.) The defendant asserted that, if Weaver were permitted to testify, the defendant would need to obtain his own expert and that he could not identify, hire, and obtain funding for an expert, provide the expert with the material for review, and confer with the expert on the presentation of the defendant's defense in the short time before evidence was set to begin.

The trial court took no action on the motion in limine until several days after evidence began on October 8, 2015. The court held a hearing on the motion on October 20. The court noted the defendant's arguments regarding the state's late disclosure and stated that it understood that the defendant was also challenging the reliability of the software that Weaver had used to generate the maps contained in his PowerPoint presentation and whether he was qualified to conduct his analysis. Defense counsel clarified, "I don't think we ever really contested that this type of information can be presented to a jury if coming in through a proper expert. And in terms of [Weaver's] qualifications, we would just like to voir dire him during his testimony if he's allowed to testify."[3]

Voir dire of Weaver then occurred outside the presence of the jury. Weaver testified that the state had first contacted him "[t]wo to three weeks ago," told him that it had phone records and records related to a GPS monitor that it wanted to have mapped, and provided him with cell phone records for the defendant, Rogers, and Anderson, and records for Anderson's GPS monitor. Weaver learned that the records associated with the defendant's phone contained the wrong set of tower information, so he downloaded the correct information from the National Cellular Assistance Data Center in the form of a Microsoft Excel spreadsheet. Weaver testified that he included that spreadsheet on a compact disc (CD) that he created, made a copy for the defense, and advised the Office of the State's Attorney in Bridgeport that the records were complete. Weaver also e-mailed the PowerPoint presentation to the state. The state told Weaver that it believed that it had the information it needed based on the PowerPoint presentation and never picked up either the original or the copy of the CD from him in Hartford.

Following Weaver's testimony, defense counsel argued that the state had violated Practice Book § 40-11[4] by failing to disclose Weaver as its expert in a timely fashion. The defendant also argued that he had never received the CD from the state that Weaver prepared, which contained not only the Excel spreadsheet but also a version of Weaver's PowerPoint presentation containing a video depicting the movement of Anderson's GPS monitor, rather than a still image. Defense counsel noted that, despite not having the underlying data from the state, he had attempted to obtain an expert witness following the state's October 1 disclosure but had not yet been successful. He argued that he had been prejudiced in his ability to meaningfully challenge Weaver's testimony and requested that the court preclude Weaver's testimony or, alternatively, grant him a "reasonable continuance . . . for at least six weeks."

The state explained that it thought the court's April

29, 2015 order required it to disclose expert opinion evidence to the defense only after the state received it. The state noted that it had provided the defense with Weaver's name on August 3, approximately two months before the state even contacted Weaver, and that the defendant was "aware that [CSLI data] was an issue we were looking into." The state claimed that it did not meet with Weaver until the end of September because it was in the process of jury selection for this trial and it was preparing for other trials. Finally, the state noted that it had "no answer" to explain why it did not pick up the CDs from Weaver or disclose them to the defendant.

In an oral ruling, the court stated: "[T]he problem I'm having is, while I know we are all busy people, I don't think it's a fair interpretation of what the Practice Book requires and what the court orders were in this case to say that, okay, as soon as we have it, we'll give it to you notwithstanding when we have it. I mean, what does that mean? Now, that would mean that you engage an expert and you have the product that you intend to offer through him the date before the evidence starts. I know that didn't happen here, but the product was delivered . . . October the first or thereabout and the evidence started on October the eighth. . . . [T]hese obligations for . . . disclosure, which were filed, [somewhat] generic, others were much more specific made months ago. And while I don't disagree with the state that this type of evidence cannot be said to be unanticipated, the problem is that, until the defense knows . . . what the state is going to present . . . it can't prepare to . . . meet that evidence by either consulting other experts or retaining other experts or what have you. That's the problem I have. That's the problem I have here.

"I'm not saying that there was bad faith involved. I'm just saying that, notwithstanding our schedules, I believe that . . . this was all an avoidable situation. . . . [T]he state could well have said, Your Honor, I need two days off from jury selection to go meet with expert so and so to see if we're going to use him, and that didn't happen. I'm just troubled by the way that this all unfolded. Again, not that there was bad faith involved, but this was . . . in my mind, an avoidable situation."

The court ultimately concluded, however, that the defendant had not suffered prejudice as a result of the late disclosure. It reasoned that "cell phone evidence, the movement of these phones and . . . the GPS, is not what I would call a . . . matter that is so novel or cutting edge or unusual that the defendant would suffer prejudice as a result of allowing its use here in court in testimony through the witness."[5] Accordingly, the court denied the defendant's motion in limine insofar as he sought to exclude Weaver's testimony in its entirety, but it did preclude two slides of the Pow-

erPoint presentation, one containing the video that the defendant never received and another containing hearsay.

Defense counsel asked whether the court was also denying the defendant's request for a continuance. The court replied, "[y]es. You can renew your motion if . . . need be at the . . . end of direct [examination]. But based upon what I've heard so far, been presented with so far, I'm denying the request for a continuance." The defendant then moved for a mistrial, which the court denied. The state thereafter provided the defense with copies of Weaver's Excel spreadsheet and CD.

The next day, before Weaver was set to testify before the jury, defense counsel informed the court that, in addition to redacting the precluded information from the PowerPoint presentation, Weaver had also changed the representation of cell site coverage areas depicted in his visual presentation from ovals to pie wedges, which narrowed the coverage areas. The court ordered a ten minute recess to allow defense counsel to meet with Weaver regarding the changes he had made to the presentation. Following the recess, defense counsel stated that, although he had a better understanding of the changes to the PowerPoint presentation, he was still unclear as to the reason for them. Defense counsel renewed his requests for preclusion and for a mistrial, and, in the alternative, asked for a continuance to at least the next day to review the new material and to prepare for cross-examination. The court granted the continuance until the following morning.

The next morning, defense counsel stated that, outside of court, Weaver had provided "some clarification" about the changes he made to his presentation. He renewed his objection to the late disclosure and argued that the revised presentation magnified the prejudice caused to the defendant because he was prevented from obtaining his own expert. The court asked defense counsel whether the changes to the presentation "impair your ability to cross-examine the witness to any greater extent than you feel you may have been impaired when [the defendant] first made the motion to preclude . . . ." Defense counsel acknowledged that the additional time had helped him prepare for cross-examination regarding the changes to the presentation.

Thereafter, Weaver testified, and his PowerPoint presentation was shown to the jury. Weaver testified that the state's attorney's office had provided him with logs for Anderson's GPS monitor and call records for three phone numbers, and asked him to map the location of both Anderson's GPS monitor and of phone calls made and received for two of the phone numbers, which the state attributed to Rogers and the defendant. Using commercial mapping software, Weaver plotted these locations, which were depicted on the maps as a person figure in the center of 120 degree pie shaped coverage

areas. The placement of the figure in the center did not mean that was the exact location of the cell phone; rather, it meant that the phone was generally within the cell tower's coverage area.

Weaver's PowerPoint presentation contained fifteen different snapshots of time. The maps and descriptions indicated Anderson's GPS location and whether the defendant's or Rogers' cell phone connected to a cell site with a "generally expected coverage area" in which Anderson's GPS was located. Snapshots nine through thirteen showed that the defendant's phone connected to a cell site whose coverage area included Anderson's GPS. Specifically, snapshot nine depicted the defendant's phone connected to a cell site whose coverage area included the location of the shootings. Snapshots ten through twelve also showed the defendant's phone as being in the same coverage area as Anderson's GPS. Finally, snapshot thirteen showed that the defendant's phone, Rogers' phone, and Anderson's GPS were all in the area of Stratford Avenue and Hollister Avenue. Weaver opined that these maps showed that the "phones moved together or met with before and/or after . . . the [victim's] murder. They either traveled to or traveled from. [Rogers' phone] moved toward the [victim's] murder with [Anderson's] GPS. And the [defendant's] phone . . . moved away and then when they actually made phone calls all together . . . within this area of Stratford and Hollister after the homicide."

On cross-examination, Weaver admitted that the prosecutor had directed him to map only those calls made when the phones were in the same proximity, and, consequently, there were several calls that had not been mapped. Specifically, Weaver did not include a phone call made from Rogers' phone to the defendant's phone at 2:14 p.m. He explained that he was asked only to plot the points and times when the two phones were together, and, because the defendant's phone was not near Rogers' at that time, he did not include it. He also did not include other cell towers that were in the area, and, as such, his presentation did not depict any coverage overlap between towers. Weaver's snapshots also did not depict the movement of the phones.

Following the jury's verdict, the defendant filed a motion for a judgment of acquittal or, in the alternative, a new trial. In support of his motion, the defendant claimed that the state's late disclosure of Weaver and the court's failure to preclude Weaver's testimony or to afford the defendant a reasonable continuance deprived the defendant of a fair trial. The court denied the motion.

On appeal, the Appellate Court concluded that the trial court had not abused its discretion in denying the motions in limine and for a continuance. *State* v. *Jackson*, supra, 183 Conn. App. 641. With regard to Weaver's testimony, the court reasoned that the sup-

pression of otherwise admissible evidence is a severe sanction, and the defendant was not challenging Weaver's qualifications or the reliability of the software he used. Id., 641–42. With respect to the continuance, the court concluded that the defendant was prejudiced by the late disclosure but that this prejudice was adequately mitigated by defense counsel's effective cross-examination of Weaver. Id., 643. It also noted that, although "the requested continuance likely would have cured any then existing prejudice to the defendant as a result of the late disclosure," had the trial court considered the feasibility of a continuance, it could have concluded that the six week continuance that defense counsel requested would be too disruptive to the trial. Id., 644.

Nonetheless, the court acknowledged that the question of whether the trial court abused its discretion in failing to order a continuance was a "close one." Id., 646. It therefore went on to conclude that, even if the denial of the continuance was an abuse of discretion, the defendant had not demonstrated that the error was harmful. Id., 648. It explained that "Weaver's testimony, although important to the state's case, also was corroborative of other testimony presented to the jury," such as Anderson's detailed description of the events on the day of the shootings and surveillance videos. Id., 648–49. It also noted that the "state's case against the defendant was relatively strong" based on Anderson's testimony, as well as other circumstantial evidence, including consciousness of guilt evidence. Id., 649.

On appeal to this court, the defendant claims that the trial court's failure to order any sanction for the state's late disclosure was an abuse of discretion because he should not have been obligated to anticipate Weaver's testimony and the state offered no good reason for its dilatory inaction. The defendant argues that permitting the state's expert to testify without providing him an opportunity to secure his own expert was harmful because it deprived him of the opportunity to effectively undermine Weaver's expert opinion, and the state's case was not strong without Weaver's testimony.

The state claims that the Appellate Court correctly concluded that the trial court did not abuse its discretion because the trial court afforded the defendant brief continuances to permit review of any belatedly disclosed materials, and it allowed extensive cross-examination. It further argues that the facts of this case do not warrant the "draconian remedy" of precluding Weaver's testimony. The state also argues that the trial court did not abuse its discretion when it denied defense counsel's request for a six week continuance because, "in substance, it granted two brief continuances, after which the defendant abandoned his request for a lengthier one." Finally, the state argues that, even if the admission of Weaver's testimony was an abuse of discretion,

such error was harmless because his testimony was corroborative of other testimony and evidence and the state's case was "remarkably strong . . . ."

Resolution of this issue is controlled by well settled principles. Pursuant to Practice Book § 40-11 (a) (3), upon written request by a defendant, the state shall disclose any "reports or statements of experts made in connection with the offense charged including results of . . . scientific tests, experiments or comparisons which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial . . . ." The state has a continuing duty to disclose such documents, and, if there is a failure to comply with disclosure, the trial court *must* take appropriate action, including the imposition of an appropriate sanction. See, e.g., *State* v. *Festo*, 181 Conn. 254, 265, 435 A.2d 38 (1980); see also Practice Book §§ 40-3 and 40-5.

Practice Book § 40-5 gives broad discretion to the trial judge to fashion an appropriate remedy for noncompliance with discovery. See, e.g., *State* v. *Respass*, 256 Conn. 164, 186, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001). The court may enter such orders "as it deems appropriate, including . . . (2) Granting the moving party additional time or a continuance . . . (4) Prohibiting the noncomplying party from introducing specified evidence . . . (5) Declaring a mistrial . . . [or] (8) Entering such other order as it deems proper." Practice Book § 40-5. "[T]he primary purpose of a sanction for violation of a discovery order is to ensure that the defendant's rights are protected, not to exact punishment on the state for its allegedly improper conduct. As we have indicated, the formulation of an appropriate sanction is a matter within the sound discretion of the trial court. . . . In determining what sanction is appropriate for failure to comply with [court-ordered] discovery, the trial court should consider the reason why disclosure was not made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." (Internal quotation marks omitted.) *State* v. *Respass*, supra, 186. As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and " 'the ultimate issue is whether the trial court could reasonably conclude as it did.' " *State* v. *Arthur H.*, 288 Conn. 582, 595, 953 A.2d 630 (2008). "In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Internal quotation marks omitted.) *State* v. *O'Brien-Veader*, 318 Conn. 514, 555, 122 A.3d 555 (2015).

The determination of whether to grant a request for

a continuance is similarly within the discretion of the trial court. See, e.g., *State* v. *Hamilton*, 228 Conn. 234, 239, 636 A.2d 760 (1994). The court, in exercising its discretion, may weigh various factors in considering a request for a continuance, including "the likely length of the delay . . . the impact of delay on the litigants, witnesses, opposing counsel and the court . . . the perceived legitimacy of the reasons proffered in support of the request . . . [and] the likelihood that the denial would substantially impair the defendant's ability to defend himself . . . ." (Internal quotation marks omitted.) *State* v. *Lopez*, 280 Conn. 779, 787, 911 A.2d 1099 (2007). "In the event that the trial court acted unreasonably in denying a continuance, the reviewing court must also engage in harmless error analysis." *State* v. *Hamilton*, supra, 242.

In the present case, we need not decide whether the trial court's decision to permit the state's late disclosed expert witness to testify was, in and of itself, an abuse of discretion. Instead, we conclude that this action was an abuse of discretion in the absence of affording the defendant a reasonable continuance to obtain his own expert. Cf. *State* v. *Festo*, supra, 181 Conn. 266 (it is appropriate for trial court to afford "the defendants more time to examine and analyze the [late disclosed] evidence in lieu of granting their motions for a mistrial and motions for suppression of evidence").

The state disclosed Weaver as an expert on October 1—only seven days before evidence began—despite knowing for at least two months that it may call Weaver, a Hartford police sergeant unconnected to the legal investigation of a Bridgeport crime, to testify.[6] The defendant had filed a motion for disclosure of the state's expert witnesses more than five months prior to the state's disclosure. Pursuant to Practice Book § 40-11 (a) (3) and the trial court's April 29 discovery order, the state was required to timely disclose to the defendant that it anticipated calling a CSLI expert. As we have explained, the rules of practice impose "on parties to a criminal proceeding a continuing duty to disclose material previously requested. . . . Practice Book [§ 40-3] requires notification *as soon as practicable under the prevailing circumstances*." (Emphasis added.) *State* v. *Gunning*, 183 Conn. 299, 306, 439 A.2d 339 (1981).

The trial court concluded that the late disclosure was avoidable, rejecting the state's explanations for the timing—that it was involved in jury selection for this case and preparing for other cases, and that it interpreted the court's April 29, 2015 discovery order to require the state to disclose expert opinion evidence only when the state received it. We agree that there was no valid reason why disclosure was not made until after voir dire began and only one week before evidence began. The state's failure to prepare for trial in a timely fashion

is not a valid reason for a late disclosure of an expert witness to the defense. Late disclosure rendered the defendant's opportunity to prepare a meaningful defense effectively nonexistent. The same exigency the state cited—that it was involved in jury selection in this case—was true for the defense as well. The only meaningful difference between the state and the defense was that the state was afforded the opportunity to disclose its expert late, but the defendant was not similarly afforded a reasonable continuance to adjust his trial strategy to respond to that eleventh hour disclosure. Indeed, we have explained that timely disclosure is designed to prevent this precise situation. See, e.g., *State* v. *Festo*, supra, 181 Conn. 265 ("[t]he purpose of criminal discovery is to prevent surprise and to afford the parties a reasonable opportunity to prepare for trial").

We also conclude that the defendant was prejudiced as a result of the late disclosure. As the Appellate Court properly recognized, "the defendant was prevented from consulting with, and potentially presenting the testimony of, his own expert."[7] *State* v. *Jackson*, supra, 183 Conn. App. 643. This is not a case in which the reasons the defendant proffered in support of the continuance were speculative. Cf. *State* v. *Delgado*, 261 Conn. 708, 714–15, 805 A.2d 705 (2002) ("trial court does not act arbitrarily or unreasonably when it denies a motion for a continuance that is supported by mere speculation").

The trial court's prejudice analysis focused on the substance of Weaver's testimony, and the court concluded that Weaver's testimony was not "so novel or cutting edge or unusual." This conclusion is inconsistent with this court's decision in *State* v. *Edwards*, supra, 325 Conn. 97. In *Edwards*, we concluded that the process of analyzing CSLI data is " 'beyond the ken of the average juror.' "[8] Id., 128. In order to meaningfully understand and challenge Weaver's testimony, it was essential for the defendant to be able to obtain his own CSLI expert. We are not persuaded that the two brief continuances the trial court gave to the defendant to obtain clarification from Weaver meaningfully alleviated the prejudice because they did not afford the defendant sufficient time to obtain funding for an expert from the Office of the Chief Public Defender and, subsequently, to secure his own CSLI expert. Consultation with the opposing expert is not a promising means of obtaining information about the weaknesses of that expert's views, which is why adverse parties typically retain their own experts.

A reasonable continuance almost undoubtedly would have rectified the prejudice. See, e.g., *State* v. *Cooke*, 134 Conn. App. 573, 579, 39 A.3d 1178 (granting continuance to allow defendant's expert to review late disclosed supplemental DNA report alleviated any preju-

dice to defendant), cert. denied, 305 Conn. 903, 43 A.3d 662 (2012); *State* v. *Van Eck*, 69 Conn. App. 482, 498–99, 795 A.2d 582 (court did not abuse discretion in electing to continue matter for almost one month for defendant to obtain records, which were not previously disclosed to him), cert. denied, 260 Conn. 937, 802 A.2d 92 (2002), and cert. denied, 261 Conn. 915, 806 A.2d 1057 (2002). As we have explained, "[a] continuance is ordinarily the proper method for dealing with a late disclosure. . . . A continuance serves to minimize the possibly prejudicial effect of a late disclosure . . . ." (Citations omitted; internal quotation marks omitted.) *Rullo* v. *General Motors Corp.*, 208 Conn. 74, 79, 543 A.2d 279 (1988). The Appellate Court also acknowledged as much. See *State* v. *Jackson*, supra, 183 Conn. App. 644 ("we recognize that the requested continuance likely would have cured any then existing prejudice to the defendant as a result of the late disclosure").

The Appellate Court nonetheless concluded that granting a six week continuance would have caused a substantial disruption to the trial, which was well under way. See id. This problem, however, was not of the defendant's making, but only he shouldered the burden of the problem created by the state's late disclosure. The defendant filed the motion in limine only six days after the state disclosed Weaver's PowerPoint presentation and one day *before* evidence began. It is unclear why the court did not hold a hearing on the motion until thirteen days later, after the start of trial, just before Weaver was called to testify. The court was on notice before trial began that the defendant sought a continuance as an alternative form of relief.

In the defendant's motion, he requested a "reasonable continuance." It was only during the hearing on the motion that he suggested that a reasonable continuance would be for "at least six weeks." Had the trial court concluded—despite not holding a hearing on the motion until thirteen days after the defendant filed it—that it would be too disruptive to the proceedings to grant a six week continuance, the court could have granted a shorter continuance. See, e.g., *State* v. *Nelson*, 118 Conn. App. 831, 846, 986 A.2d 311 (it was not abuse of discretion for court to grant one month continuance when defendant asked for two month continuance), cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010); *United States* v. *Turner*, 897 F.3d 1084, 1101–1102 (9th Cir. 2018) (it was not abuse of discretion to provide shorter continuance than requested), cert. denied,     U.S.    , 139 S. Ct. 1234, 203 L. Ed. 2d 247 (2019); see also *State* v. *Respass*, supra, 256 Conn. 186 (court has broad discretion to afford remedy under Practice Book § 40-5). We acknowledge that defense counsel failed to adequately explain specifically why his request for a six week continuance was reasonable or to request a continuance for a shorter period of time. Nonetheless, defense counsel's failure to engage in such a discussion

with the trial court does not excuse the resulting prejudice to the defendant. Accordingly, we conclude that it was an abuse of discretion for the trial court to allow the state's late disclosed expert witness to testify without first providing the defendant with a reasonable continuance to obtain his own expert.

The state argues that the trial court did not abuse its discretion in declining to order a continuance because defense counsel abandoned his request by not renewing it after the state's direct examination of Weaver, as the court had suggested. The state notes that defense counsel proceeded with his cross-examination of Weaver and, subsequently, proffered his own investigator as a witness on cell phone location. The state points out that, when defense counsel proffered the investigator's testimony, he stated, "I'm not seeking a further continuance."

We agree with the Appellate Court that defense counsel did not abandon his request for a continuance. See *State* v. *Jackson*, supra, 183 Conn. 646. Defense counsel noted numerous times after Weaver's testimony that the defendant was prejudiced by the denial of counsel's request for a continuance. Defense counsel's statement that he was "not seeking a further continuance" was in response to the trial court's misunderstanding that the defense was seeking a continuance before proffering the testimony of its investigator on CSLI. The court stated that, "before [Weaver] took the stand yesterday and today . . . you had said that you were not looking for a *further continuance*, that you were ready to go forward *preserving your grounds for the motion to preclude* that you had articulated before." (Emphasis added.) In response, defense counsel stated, "I'm not seeking a further continuance. We would be able to call [the investigator] this afternoon."[9]

Having concluded that it was an abuse of discretion for the trial court to allow the state's late disclosed expert witness to testify without first giving the defendant a reasonable continuance to obtain his own expert, we must now determine whether that error was harmful. "[W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error." (Internal quotation marks omitted.) *State* v. *Eleck*, 314 Conn. 123, 129, 100

A.3d 817 (2014). "[A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Pascual*, 305 Conn. 82, 93, 43 A.3d 648 (2012).

After reviewing the evidence in the present case, we cannot conclude that we have a fair assurance that the admission of Weaver's testimony, without affording the defendant a reasonable continuance to obtain his own expert to meaningfully challenge Weaver's testimony, did not substantially affect the verdict in this case. The state's case was based primarily on the testimony of Weaver and Anderson. There is no doubt that Weaver's expert testimony was central to the state's case because his testimony and PowerPoint presentation were the only objective evidence that placed the defendant's phone in the same area as Rogers' phone and Anderson's GPS around the time of the shootings. Although several eyewitnesses identified Rogers as a shooter, the identity of the second suspect was a central issue in the case, and the only objective evidence identifying the defendant as the second suspect was Weaver's expert testimony.[10] There can be little doubt that jurors would have viewed as highly convincing Weaver's expert opinion; the testimony was presented in technical terms and used impressive visual displays to convey important information, and it came from a law enforcement officer unconnected to the department that investigated the crime. Cf. *State* v. *Boyd*, 295 Conn. 707, 744, 992 A.2d 1071 (2010) (evidentiary error was harmless because, among other things, "cell phone records provided strong evidence that the defendant had been in the area" where murder occurred), cert. denied, 562 U.S. 1224, 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011). No eyewitnesses identified the defendant as one of the perpetrators. Moreover, the defendant's DNA was never found in Anderson's car.

The Appellate Court acknowledged that Weaver's testimony was "important to the state's case" but concluded that it was "corroborative of other testimony presented to the jury. The jury heard Anderson's detailed description of the events on the day of the shootings. Anderson identified the defendant as the man he picked up on Palisade Avenue on the afternoon of the shootings. Anderson testified that he dropped the defendant and Rogers off near the scene of the shootings and heard 'firecracker sounds' while they were gone." *State* v. *Jackson*, supra, 183 Conn. App. 648–49. Anderson, however, had both a motive to testify falsely and credibility issues. When Anderson first met with the police, they asked if he knew anyone called "Red Dreads,"[11] and Anderson asked if they meant "Little Red." The police then asked him if he knew someone called "Little Red Dreads," and he replied no. During a second meeting with the police eight days later, the police showed Anderson a photographic array con-

taining the defendant's picture, but Anderson did not identify the defendant. It was not until nearly five months later, after Anderson had been charged with conspiracy to commit murder and was being held in prison, that he requested a third meeting with the police, at which he identified the defendant as the individual he had picked up. Prior to that third meeting, Anderson had attended a court proceeding where he saw the defendant and heard people calling the defendant "Red Dreads." After requesting the third meeting with the police, Anderson asked the police whether Red Dreads was the name of the individual they had previously asked him about. He then chose the defendant's photograph from an array, asserting that he was Red Dreads. Anderson signed an agreement that gave him immunity for anything he told to the police, and the state promised it would let the judge know how he performed as a witness against the defendant and Rogers when he was sentenced. After the defendant was sentenced, the state dismissed Anderson's conspiracy to commit murder charge, and he pleaded guilty to hindering prosecution in the second degree, for which he received an unconditional discharge.

The Appellate Court also noted that surveillance videos corroborated much of Anderson's testimony. Id., 649. The surveillance videos, however, do not clearly depict the backseat passenger in Anderson's car. The footage that the state points to as depicting the backseat passenger, state's exhibit 34, simply depicts a figure that appears to be a man opening and closing the rear passenger door of Anderson's car and then exiting the car at Stratford Avenue and Hollister Avenue, approximately fifteen minutes after the shootings. That individual appears to have dreadlocks and is wearing a hat with a logo. Although the state introduced evidence that the defendant had dreadlocks and a hat with a similar logo, no eyewitnesses to the shootings described the second suspect as wearing a hat or having dreadlocks. In fact, the video shows the individual that exited Anderson's car was wearing jeans, while some eyewitness testimony described the second suspect as wearing khaki pants. Finally, the video captured the period approximately fifteen minutes *after* the shootings, which allows for the possibility that the individual exiting the car at Stratford Avenue and Hollister Avenue is not the second suspect involved in the shootings but, rather, someone else who subsequently entered Anderson's car.[12]

In sum, the defendant was prevented from meaningfully challenging the state's late disclosed expert witness because he could not obtain his own expert. Given the centrality of Weaver's expert testimony to the state's case—because it was the only objective evidence placing the defendant in the same area as Rogers around the time of the shootings—we cannot conclude, with a fair assurance, that the error did not substantially

affect the verdict. Accordingly, we conclude that the error was harmful and that the defendant is entitled to a new trial.

## II

Although our conclusion in part I of this opinion is dispositive of the appeal, in the interest of judicial economy, we consider whether any of the other claims raised by the defendant are sufficiently likely to arise in a new trial that we should address them. See, e.g., *State* v. *Norman P.*, 329 Conn. 440, 454, 186 A.3d 1143 (2018); *State* v. *Chyung*, 325 Conn. 236, 260 n.21, 157 A.3d 628 (2017). The defendant's claim that the Appellate Court improperly upheld the trial court's exclusion of his investigator's testimony is not likely to occur in a new trial because the defendant sought to introduce this testimony to "ameliorate the harm" caused by his inability to secure his own expert. The defendant will be able to obtain his own CSLI expert on retrial. The defendant's fourth claim is not likely to arise in a new trial because, pursuant to *State* v. *Edwards*, supra, 325 Conn. 97, if the defendant requests a hearing in accordance with *State* v. *Porter*, supra, 241 Conn. 57, prior to the admission of CSLI expert testimony, the trial court would be required to hold one.

Finally, we decline to address the defendant's third claim, namely, that the trial court abused its discretion by admitting evidence regarding the defendant's failure to appear in court on unrelated criminal charges as evidence of consciousness of guilt in this case. We recognize that whether the trial court abused its discretion by admitting this consciousness of guilt evidence presents an interesting question, but we need not address it here because the record could look different on retrial. Cf. *State* v. *Rizzo*, 266 Conn. 171, 250 n.44, 833 A.2d 363 (2003). We leave it to the trial court to further evaluate the issue if the state pursues it on remand.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to that court for a new trial.

In this opinion the other justices concurred.

[1] The defendant also was charged with one count of criminal possession of a firearm. The court granted the defendant's motion to sever that count from the state's information. The state subsequently entered a nolle prosequi as to that count.

[2] The jury also found Rogers guilty of the same offenses. See *State* v. *Rogers*, 183 Conn. App. 669, 671–72, 193 A.3d 612 (2018), petition for cert. filed (Conn. September 28, 2018) (No. 180205). Rogers' conviction is not at issue in this appeal.

[3] Because the defendant does not challenge Weaver's qualifications as an expert, we do not evaluate those qualifications or assess whether he would be qualified to testify as an expert.

[4] Practice Book § 40-11 (a) provides in relevant part: "Upon written request by a defendant filed in accordance with Section 41-5 and without requiring any order of the judicial authority, the prosecuting authority, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose in writing the existence of, provide photocop-

ies of, and allow the defendant in accordance with Section 40-7, to inspect, copy, photograph and have reasonable tests made on any of the following items . . . (3) Any reports or statements of experts made in connection with the offense charged including results of physical and mental examinations and of scientific tests, experiments or comparisons which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial . . . ."

[5] The court did not explain why, if CSLI evidence was not "novel or cutting edge or unusual," the state would nonetheless require an expert to present this evidence. We note, however, that, when the trial court denied the defendant's motion in limine, it did not have the benefit of our decision in *State* v. *Edwards*, supra, 325 Conn. 97. In *Edwards*, we held that a court must conduct a hearing pursuant to *State* v. *Porter*, supra, 241 Conn. 57, before admitting testimony and evidence regarding CSLI because "the process [the CSLI witness] used to arrive at his conclusions [is] beyond the ken of [the] average juror." *State* v. *Edwards*, supra, 128, 133.

[6] The state contends that the trial court did not abuse its discretion in denying the request for a continuance because the "coordinates (except those in the . . . spreadsheet related to Rogers' phone) had been provided through discovery well before trial," and, thus, the defendant could have secured an expert witness to review the records. We are not persuaded. The disclosure of the cell phone records did not give the defendant notice that the state would call an expert who would generate a PowerPoint presentation and testify that he believed the defendant was in the area at the time of the shootings. As the trial court noted, "the problem is that, until the defense knows . . . what the state is going to present . . . it can't prepare to . . . meet that evidence by either consulting other experts or retaining other experts . . . ."

[7] The Appellate Court also noted, however, that, "[a]lthough the late disclosure deprived the defendant of the opportunity to consult with his own expert, defense counsel conducted an effective cross-examination of Weaver." *State* v. *Jackson*, supra, 183 Conn. App. 643. We agree with the defendant that the fact that he elicited some favorable testimony during cross-examination does not remedy the fact that he was deprived of the opportunity to present his own expert witness who might have opined that the defendant was not in the area at the time of the shooting and who might have provided assistance to his attorney by identifying other areas in which he should question Weaver. The expert also might have explained why Weaver's opinion and methodology were faulty.

[8] As we previously noted, at the time the trial court denied the defendant's motion in limine, it did not have the benefit of our decision in *State* v. *Edwards*, supra, 325 Conn. 97. See footnote 5 of this opinion.

[9] Defense counsel explained that he was calling his investigator to "ameliorate the harm [in] some limited way to be able to put what we've identified in terms of . . . where that cell tower was located [at the 2:14 p.m. call]." Specifically, defense counsel sought to have his investigator testify that, based on CSLI data, the defendant's cell phone was on the west side of Bridgeport during the 2:14 p.m. call with Rogers, which would have made it "practically impossible" for him to get to the east side of the city where Anderson had allegedly picked him up shortly after the call. The state did not object to this testimony. Nevertheless, the court subsequently precluded the defendant's investigator from testifying. Thus, to the extent there was any further opportunity for the court to mitigate the prejudice from the state's late disclosure of Weaver by permitting the defendant's investigator to testify, it was lost.

[10] The state contends that the state's case was "remarkably strong," based on Anderson's testimony and because the defendant was "linked to Rogers through cell phone call logs," a bandana found in Rogers' home, and the text Rogers sent to the defendant when he was arrested. This evidence, however, establishes nothing more than an association between Rogers and the defendant, and does not establish that the defendant was a passenger in Anderson's car at the time of the shootings.

[11] Anderson subsequently testified that Red Dreads was the defendant and that Red Dreads was the individual he picked up on Palisade Avenue. Anderson also testified, however, that the individual he picked up was wearing sunglasses and that Anderson did not know him.

[12] We note that state's exhibit 29, a surveillance video taken from Grandview Avenue around the time of the shootings, depicts Anderson's car pulling to the side of the road and two individuals exiting the car. One individual is wearing dark colored pants and a hooded sweatshirt with the

hood pulled over his head, and the other individual is wearing khaki pants. No distinguishing features of the backseat passenger are depicted in the video.

_____