******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* RODERICK ROGERS
## (SC 20469)

McDonald, D'Auria, Mullins, Ecker and Alexander, Js.

*Syllabus*

Convicted of the crimes of murder, conspiracy to commit murder, and assault in the first degree, the defendant appealed. The defendant and his cousin, A, had been driving when they stopped to pick up the defendant's friend, J. They then drove to a housing complex, where the defendant and J exited the car and shot five individuals, one of whom died. The defendant and J returned to A's car and left the scene. Because A was on probation, he wore a global positioning system (GPS) device that tracked his movement. Thereafter, the defendant and J were arrested, and their cases were consolidated and tried jointly. Prior to trial, the defendant filed a motion in limine seeking either the preclusion of evidence of information pertaining to the location of his cell phone or a hearing pursuant to *State* v. *Porter* (241 Conn. 57) to determine the scientific reliability of such evidence. The trial court did not rule on the defendant's motion, and he did not renew it at trial. The state never disclosed an expert witness, but, when jury selection began, the state provided the defendant with a list of witnesses, which included W, whom it identified only as a police officer. Seven days before evidence began, the state provided the defendant with W's resume and a copy of a slideshow presentation, prepared by W, that purportedly charted the location of the defendant's and J's cell phones, and A's GPS device around the time of the shooting. J filed a motion in limine to preclude W's testimony because of the state's untimely disclosure of W as an expert on cell site location data. The defendant's counsel did not file a similar motion, join J's motion, or raise any concerns regarding the untimely disclosure at the hearing on J's motion. The court denied J's motion, and, at trial, W's testimony and cell site location data showed that J, but not the defendant or A, had been near the crime scene at the time of the shooting. The defendant did not object to W's testimony or the cell site location data and did not request a *Porter* hearing at that time. While cross-examining W, the defendant's counsel emphasized that the data showed that the defendant had been with A in locations other than the crime scene, both before and after the shooting. After the defendant and J were convicted, the defendant appealed to the Appellate Court, claiming that the trial court improperly had admitted into evidence W's testimony regarding the cell site location information without first conducting a *Porter* hearing, as required by this court's decision in *State* v. *Edwards* (325 Conn. 97). The Appellate Court disagreed and affirmed the defendant's conviction. During the pendency of the defendant's appeal to this court from the Appellate Court's judgment, this court reversed J's conviction on the ground that the trial court had abused its discretion when it allowed W to testify without first granting J's request for a reasonable continuance to obtain his own cell site information expert. Thereafter, this court granted the defendant's petition for certification to appeal to this court, and the defendant claimed that, even though he admittedly failed to preserve any objection to the state's untimely disclosure of W, this court should exercise its supervisory authority over the administration of justice to grant him the same remedy as J because they were tried jointly and suffered the same harm. The defendant also claimed on appeal that this court should review the merits of his unpreserved claim that the trial court improperly had failed to conducted a *Porter* hearing in accordance with *Edwards*. *Held*:

1. This court declined the defendant's request to exercise its supervisory authority over the administration of justice to reverse his conviction, despite his failure to preserve any objection to the state's untimely disclosure of W as an expert witness, as the defendant and J were not similarly situated or similarly harmed by the state's untimely disclosure of W: W's testimony regarding the cell site location data was less prejudicial to the defendant than it was to J insofar as it did not place the

defendant near the crime scene at the time of the shooting, as it did with J; moreover, W's testimony demonstrated, and the defendant's counsel emphasized during cross-examination of W, that the defendant and A were together and not at the scene of the shooting both before and after it occurred, which suggested that defense counsel may have had strategic reasons for not objecting to W's testimony; furthermore, the state's case against the defendant was strong, as multiple witnesses identified him as the shooter, and a probation officer testified that he had witnessed A pick up the defendant from his home before the shooting and the defendant arrive back home after the shooting, whereas W's testimony was central to the state's case against J, who could not be identified as the shooter by any eyewitness; accordingly, because the defendant was not similarly situated to J, it was not anomalous to treat the defendant and J differently, and fairness and justice did not require the reversal of the defendant's conviction.

2. This court declined to review the defendant's unpreserved *Porter* claim: the trial court never ruled on the defendant's pretrial motion in limine requesting a *Porter* hearing, he did not renew that request at trial, and this court recently rejected the same arguments that the defendant raised in the present case and determined that the retroactivity of the nonconstitutional evidentiary rule announced in *Edwards*, namely, that a *Porter* hearing is required to assess the scientific reliability of expert testimony concerning cell phone location information, does not relieve a defendant of his obligation to preserve such a claim; moreover, contrary to the defendant's contention, the requirement of preservation did not frustrate judicial economy by forcing attorneys to raise any conceivable legal claim in the hope that the law would change in the future.

Argued May 2—officially released August 16, 2022

*Procedural History*

Substitute information charging the defendant with four counts of the crime of assault in the first degree, and with one count each of the crimes of murder, conspiracy to commit murder and criminal possession of a firearm, brought to the Superior Court in the judicial district of Fairfield, where the court, *Kavanewsky, J.*, granted the defendant's motion to sever the charge of criminal possession of a firearm and the state's motion to consolidate the case for trial with that of another defendant; thereafter, the cases were tried to the jury; verdict of guilty; subsequently, the state entered a nolle prosequi as to the charge of criminal possession of a firearm, and the court, *Kavanewsky, J.*, rendered judgment in accordance with the verdict, from which the defendant appealed to this court; thereafter, the case was transferred to the Appellate Court, *Lavine, Alvord* and *Beach, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Megan L. Wade*, assigned counsel, with whom, on the brief, was *James P. Sexton*, assigned counsel, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *C. Robert Satti, Jr.*, former supervisory assistant state's attorney, for the appellee (state).

*Opinion*

D'AURIA, J. In this certified appeal, we must determine whether the reversal of a codefendant's conviction necessitates the reversal of a defendant's conviction despite the defendant's failure to preserve the issue at trial when the defendant and codefendant were jointly tried and the codefendant properly preserved the issue. Specifically, the defendant, Roderick Rogers, appeals from the judgment of conviction, rendered after a jury trial, of one count of murder in violation of General Statutes § 53a-54a (a), one count of conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48, and four counts of first degree assault in violation of General Statutes § 53a-59 (a) (5). On appeal, he claims that, in light of this court's recent decision in *State* v. *Jackson*, 334 Conn. 793, 224 A.3d 886 (2020), in which his codefendant, Raashon Jackson, was granted a new trial premised on his properly preserved objection to the state's untimely disclosure of an expert witness, this court should exercise its supervisory authority over the administration of justice to reverse his conviction, even though he did not join in Jackson's objection to the untimely disclosed expert, because they were tried jointly and suffered the same harm. Additionally, he requests that this court overrule our recent decision in *State* v. *Turner*, 334 Conn. 660, 686–87, 224 A.3d 129 (2020), and review the merits of his unpreserved *Porter*[1] claim under *State* v. *Edwards*, 325 Conn. 97, 156 A.3d 506 (2017). We affirm the judgment of conviction.

We begin by briefly summarizing the facts the jury reasonably could have found, as recited recently in Jackson's certified appeal from the Appellate Court's judgment. "On September 10, 2013, [the defendant] called his cousin, David Anderson, for a ride from [his] home in Bridgeport. Before Anderson arrived, a social worker, William Muniz, came to [the defendant's] house at 2:10 p.m. to discuss a job opportunity. [The defendant] informed Muniz that he had to leave but would be back in one hour. As Muniz was leaving, Anderson arrived. Because Anderson was on probation, he wore a global positioning system (GPS) device that tracked his movements.

"Anderson and [the defendant] left the house in Anderson's car, and [the defendant] directed Anderson to drive toward Palisade Avenue, on the east side of Bridgeport. On Palisade Avenue, [the defendant] saw [Jackson], a friend whom he called Red Dreads, and directed Anderson to stop the car. [Jackson] got into the backseat of Anderson's car. [The defendant] then directed Anderson to drive to the 'Terrace,' a reference to the Beardsley Terrace housing complex located in the north end of Bridgeport. After arriving at the housing complex, [the defendant] told Anderson to park on a side street off Reservoir Avenue. [The defendant] asked

Anderson if he had an extra shirt, and Anderson told him to check the trunk. [The defendant] asked Anderson to wait because he and [Jackson] would be right back. [Jackson] and the defendant got out of the car, went to the open trunk, shut the trunk, and walked down a hill.

"At that time, a group of young men was gathered outside the housing complex. [Jackson] and the defendant approached the group, remarked, 'y'all just came through the Ave shooting Braz, you all f'ed up,' and either [Jackson] or the defendant began shooting at the group. One of the shooting victims, LaChristopher Pettway, sustained a fatal gunshot wound to his back. Four other victims, Tamar Hamilton, Leroy Shaw, Jauwane Edwards, and Aijahlon Tisdale, sustained nonfatal wounds.

"[Jackson] and the defendant then left the scene of the shootings and returned to Anderson's car. [The defendant] told Anderson to drive down Reservoir Avenue. Anderson then drove to the corner of Stratford Avenue and Hollister Avenue, where Anderson parked the car on the side of the street. [Jackson] got out of the car, and Anderson drove [the defendant] home. [The defendant] called Muniz at 2:46 p.m., and Muniz returned to [the defendant's] home by 3 p.m." *State* v. *Jackson*, supra, 334 Conn. 797–98.

On September 16, 2013, the defendant was arrested. Id., 798. That same day, he sent Jackson a text message stating that "[d]ey taken [me]." (Internal quotation marks omitted.) Id. Jackson was subsequently arrested. Id. Both men were charged with murder, conspiracy to commit murder, and four counts of assault in the first degree. Id., 798; see id., 799 n.2. The trial court granted the state's motion to consolidate for trial the defendant's case with Jackson's case, and the two were tried jointly before a jury. See id., 798.

At trial, Anderson testified as a cooperating witness for the state. See id., 798. Over defense counsel's objection, the state also presented the testimony of an expert on cell site location information (CSLI), Sergeant Andrew Weaver of the Hartford Police Department, who testified to the location of Jackson's and the defendant's cell phones, and Anderson's GPS monitor. Id., 798–99.

The jury found both the defendant and Jackson guilty on all counts, and the court sentenced the defendant to a total effective term of forty-five years of incarceration. He then appealed, challenging certain of the trial court's evidentiary rulings. See *State* v. *Rogers*, 183 Conn. App. 669, 193 A.3d 612 (2018). Relevant to the present appeal, the defendant claimed that the trial court improperly had admitted into evidence maps depicting the location of his and Jackson's cell phones and related testimony without first conducting a *Porter*

hearing, as required by our recent decision in *Edwards*. Id., 682. The Appellate Court rejected each of the defendant's evidentiary claims and affirmed the judgment of conviction. See id., 689–90. This court then granted the defendant's petition for certification to appeal.[2] Additional facts and procedural history will follow as required.

I

Recently, in *Jackson*, we reversed that defendant's conviction based on his properly preserved objection to the state's untimely disclosure of Weaver as an expert. Specifically, we held that the trial court had abused its discretion by failing to afford Jackson a reasonable continuance and that this error was harmful. See *State v. Jackson*, supra, 334 Conn. 809–10. Notwithstanding that he did not independently object, or join Jackson's objection, to the state's untimely disclosure of Weaver, the defendant requests that this court exercise its supervisory authority to either reverse his conviction or review his unpreserved claim that the untimely disclosure prejudiced him. Specifically, he argues that this is an exceptional circumstance because he and Jackson were tried jointly, and it would be unfair for Jackson's conviction, but not his conviction, to be reversed based on a failure of preservation when both he and Jackson were similarly harmed. He contends that the present case is similar to federal cases in which courts have reversed a defendant's conviction based on an unpreserved claim when the defendant was tried jointly with a codefendant, and the codefendant properly preserved and succeeded on the claim. Because we determine that Jackson and the defendant in the present case were not similarly situated and, thus, not similarly harmed by the state's late disclosure of Weaver, we decline to exercise our supervisory authority to either reverse the defendant's conviction or to review his unpreserved claim.

Approximately six months before trial started, the trial court ordered the state to disclose any experts to the defense. The state never specifically disclosed any witness as an expert. Rather, when jury selection began, the state provided the defendant with a list of 128 potential witnesses, including Weaver, whom it did not identify as an expert but as a member of the Hartford Police Department. Id., 801. Seven days before evidence began, however, the state provided the defendant with Weaver's resume and a copy of a PowerPoint computer software presentation Weaver had prepared, which the state would argue charted the locations of cell phones associated with the defendant and Jackson, as well as the GPS unit worn by Anderson around the time of the shootings. Id. In response, the day before evidence began, Jackson's counsel moved in limine, seeking to preclude Weaver's testimony based on the state's untimely disclosure of Weaver as a CSLI expert. Id.,

801–802. Counsel for the defendant did not file a similar motion or join Jackson's motion. The trial court held a hearing on Jackson's motion several days after evidence began but before Weaver testified before the jury. Id., 802. Counsel for Jackson argued that the state's late disclosure prejudiced Jackson and that the proper remedy was either a reasonable continuance of six weeks or suppression of the testimony. Id., 804. At no time during the hearing did counsel for the defendant object to the untimely disclosure, join Jackson's motion, or raise any concerns regarding the untimely disclosure before the trial court. The trial court ultimately denied Jackson's motion, including his request for a continuance, despite determining that the delay was avoidable. Id., 804–806.

At trial, Weaver testified before the jury "that the state's attorney's office had provided him with logs for Anderson's GPS monitor and call records for three phone numbers, and asked him to map the location of both Anderson's GPS monitor and of phone calls made and received for two of the phone numbers, which the state attributed to [Jackson] and the defendant. Using commercial mapping software, Weaver plotted these locations, which were depicted on the maps as a person figure in the center of 120 degree pie shaped coverage areas. The placement of the figure in the center did not mean that was the exact location of the cell phone; rather, it meant that the phone was generally within the cell tower's coverage area.

"Weaver's PowerPoint presentation contained fifteen different snapshots of time. The maps and descriptions indicated Anderson's GPS location and whether the defendant's or [Jackson's] cell phone connected to a cell site with a 'generally expected coverage area' in which Anderson's GPS was located." Id., 807. Snapshot one depicted Anderson's GPS in the east end of Bridgeport prior to the shooting. Snapshots two and four depicted the defendant's phone as being in the same coverage area as Anderson's GPS in the east end of Bridgeport prior to the shooting but moving westward toward the crime scene. Neither the defendant's nor Jackson's cell phone is depicted in snapshots three, five, six, seven, or eight, which show Anderson's GPS moving closer to the crime scene. Snapshot nine, however, shows that Jackson's phone connected to a cell site whose coverage area included the location of Anderson's GPS and the location of the shootings near the time of the shooting. Snapshots ten through twelve also showed Jackson's phone as being in the same coverage area as Anderson's GPS immediately after the shooting, with the data showing that those two travelled eastward. Snapshot thirteen is the first snapshot to depict the cell phones of both the defendant and Jackson, as well as Anderson's GPS, with all three located in the east end of Bridgeport in the same coverage area approximately twenty-five minutes after the shooting.

Weaver opined that these maps showed that the "phones moved together or met with [each other] before and/or after . . . the [victim's] murder. They either traveled to or traveled from [the crime scene together]. [The defendant's phone] moved toward the [victim's] murder with [Anderson's] GPS. And [Jackson's] phone . . . moved away and then . . . they actually made phone calls all together . . . within this area of Stratford and Hollister [Avenues] after the homicide."

On cross-examination, counsel for the defendant asked Weaver if all of the snapshots depicting the location of the defendant's phone showed that he was in the east side of Bridgeport. Weaver answered, "yes." Additionally, defense counsel asked Weaver to confirm that none of the snapshots depicting the location of the crime scene showed the presence of the defendant's phone. Weaver again responded affirmatively.

In addition to the CSLI evidence, at trial, the state offered significant evidence regarding the defendant's role in the shooting. Specifically, the state offered the testimony of Muniz, who stated that he met with the defendant at his house at approximately 2:10 p.m., which was prior to the shooting, to discuss a job opportunity but that the defendant said that he had to leave and would be back in about one hour. Muniz testified that he saw a white car arrive and the defendant leave in that white car. He then testified that the defendant later called him at approximately 2:46 p.m., which was after the shooting occurred, to inform him that he was back home, and that he met the defendant at his home at approximately 3 p.m. Additionally, the state offered the testimony of Anderson, who stated that the defendant called him and asked for a ride; that he picked up the defendant at his house in a white Nissan Maxima; that the defendant directed him where to drive; that the defendant saw Jackson and that Jackson got into the car; that the defendant told him to park and then got out of the car with Jackson; that he stayed in the car until the defendant and Jackson returned; and that he then drove away. Most importantly, the state offered evidence from three victims of the shooting, Hamilton, Shaw, and Tisdale, all of whom identified the defendant as the shooter.

Although the defendant and Jackson were tried jointly, we granted Jackson's request for certification to appeal from the judgment of the Appellate Court approximately eighteen months before we granted certification to appeal in the present case.[3] On appeal before this court in *Jackson*, Jackson claimed, among other things, that, in light of the state's untimely disclosure of Weaver after jury selection began and only one week before evidence commenced, the trial court abused its discretion by either failing to preclude Weaver's testimony or failing to grant a reasonable continuance. *State* v. *Jackson,* supra, 334 Conn. 809–10. This

court agreed with the trial court that the delayed disclosure was avoidable: "The state's failure to prepare for trial in a timely fashion is not a valid reason for a late disclosure of an expert witness to the defense." Id., 813. We concluded that the trial court had abused its discretion, however, in failing to afford Jackson a reasonable continuance to obtain his own expert, although not necessarily six weeks long, as Jackson had requested. See id., 816. Additionally, we determined that this error was harmful: "The state's case was based primarily on the testimony of Weaver and Anderson. There is no doubt that Weaver's expert testimony was central to the state's case because his testimony and PowerPoint presentation were the only objective evidence that placed [Jackson's] phone in the same area as [the defendant's] phone and Anderson's GPS around the time of the shootings. Although several eyewitnesses identified [the defendant] as a shooter, the identity of the second suspect was a central issue in the case, and the only objective evidence identifying [Jackson] as the second suspect was Weaver's expert testimony. There can be little doubt that jurors would have viewed as highly convincing Weaver's expert opinion; the testimony was presented in technical terms and used impressive visual displays to convey important information, and it came from a law enforcement officer unconnected to the department that investigated the crime. . . . No eyewitnesses identified [Jackson] as one of the perpetrators. Moreover, [Jackson's] DNA was never found in Anderson's car." (Citation omitted; footnote omitted.) Id., 818–19. As a result, we reversed the judgment of conviction and remanded the case for a new trial. See id., 822.

On appeal before this court, the defendant now claims that, in the interest of justice, we should exercise our supervisory authority to afford him the same remedy as Jackson, despite his undisputed failure to preserve any objection to the state's untimely disclosure of Weaver as an expert witness. "[W]e will reverse a conviction under our supervisory powers only in the rare case [in which] fairness and justice demand it. . . . [The issue at hand must be] of [the] utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) *State* v. *Turner*, supra, 334 Conn. 687. In determining whether to exercise our supervisory powers to review an unpreserved claim, we consider the following factors: the record must be adequate for review; all parties must have had an opportunity to be heard on the issue; and review must not create unfair prejudice to any party.[4] See, e.g., *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 155–56, 84 A.3d 840 (2014).

This court has not previously decided whether, under our supervisory authority, a defendant is entitled to the

benefit of a codefendant's preservation of an objection when tried jointly. On two prior occasions, however, this court has held that, under certain circumstances, a defendant's unpreserved claim may be treated as preserved if his codefendant, who was tried jointly with him, preserved the same claim. Specifically, we have held that "the failure by [a defendant] fully to challenge the [ruling of the trial court] at trial would not be dispositive [of whether the defendant may raise the claim], [if] his codefendant [who was tried jointly] adequately alerted the trial court to the possibility of error in a timely fashion." (Internal quotation marks omitted.) *State* v. *Dahlgren*, 200 Conn. 586, 599–600 n.9, 512 A.2d 906 (1986), quoting *State* v. *Pelletier*, 196 Conn. 32, 34, 490 A.2d 515 (1985). Since *Dahlgren*, however, this court has clarified that *Pelletier* and its progeny "[do] not stand for the proposition that whenever a codefendant makes a trial motion in which the defendant did not join, the silent defendant may raise the denial of the motion in his appeal. . . . When a defendant does not join a codefendant's motion for tactical or other reasons, the defendant cannot later complain of the procedure on appeal." (Citation omitted; internal quotation marks omitted.) *State* v. *Gould*, 241 Conn. 1, 9 n.3, 695 A.2d 1022 (1997). We have held that a defendant is not entitled to the benefits of a codefendant's properly preserved objection if it would "not be anomalous to treat the review of each of the defendants' claims . . . differently." Id.; see also *State* v. *Walton*, 227 Conn. 32, 55 n.20, 630 A.2d 990 (1993) (same).

The defendant in the present case does not specifically rely on this case law but, rather, makes a similar argument in support of this court's exercising its supervisory authority to either reverse his conviction or treat his claim as preserved, contending that it would be anomalous and unjust to treat similarly situated defendants differently. We decline, however, to either reverse the defendant's conviction or to treat his claim as preserved under either our supervisory authority or pursuant to *Pelletier* and its progeny because we see no anomaly in treating the defendant in the present case differently than Jackson when they are not similarly situated in that they could not have suffered the same prejudice from the same error. Specifically, unlike with Jackson, the CSLI data never placed the defendant near the crime scene at the time of the shooting. Rather, the evidence at issue showed that the defendant was with Anderson in the east end of Bridgeport both before and after the shooting, which defense counsel emphasized on cross-examination. Not only does this point show that this evidence was less prejudicial to the defendant than to Jackson, it also suggests that defense counsel may have had strategic reasons for not objecting to this evidence, further militating against review and reversal. Additionally, unlike with Jackson, the state's case against the defendant was very strong, with multiple

eyewitnesses identifying him as the shooter. Moreover, there was testimony from Muniz, which established that Anderson had picked up the defendant prior to the shooting and that the defendant then arrived back home after the shooting. As a result, the defendant and Jackson were not similarly situated or similarly harmed by the state's untimely disclosure of Weaver as an expert, and we cannot conclude that fairness and justice require reversal of the defendant's conviction. Therefore, we decline to exercise our supervisory authority.[5]

Our conclusion is consistent with holdings of courts in other jurisdictions, which, likewise, have held under their supervisory authority or as a matter of plain error that a defendant's conviction must be reversed, or his unpreserved claim treated as preserved, only if his codefendant, with whom he was tried jointly, properly preserved the claim and the defendant was similarly situated and equally harmed. See, e.g., *Lawyer* v. *State*, 28 So. 3d 220, 220 (Fla. App. 2010) (holding that court would review defendant's unpreserved claim and reverse his conviction when codefendant, who was tried jointly with defendant, properly preserved and succeeded on same claim, and both defendants were similarly situated in that their defenses were "closely intertwined"); *People* v. *Robinson*, 13 N.Y.2d 296, 302, 196 N.E.2d 261, 246 N.Y.S.2d 623 (1963) (holding that, "in the interests of justice," court would review defendant's unpreserved claim and reverse his conviction when codefendant, who was tried jointly with defendant, properly preserved and succeeded on same claim and error was equally harmful to both defendants); *State* v. *Montwheeler*, 277 Or. App. 426, 439, 371 P.3d 1232 (2016) (holding that when, during joint trial, codefendant properly preserved claim, "the ends of justice militate[d] in favor of correcting the [defendant's unpreserved] error" because both "defendants presented a unified theory of defense [and, thus] the trial court's error harmed both defendants"); *Rivera* v. *People*, 64 V.I. 540, 587 (2016) ("disparate treatment of identically situated [codefendants] constitute[d] 'manifest injustice,' " even if issue was raised by one defendant but waived by another, overriding any interest associated with complying with preservation requirements); *Williams* v. *People*, 59 V.I. 1024, 1032 n.3 (2013) ("when one [codefendant] receives reversal on appeal by raising an issue that a second [codefendant] neglected to brief, the interests of justice require providing the second [codefendant] with the same remedy" unless error affects defendants differently); see also *United States* v. *Cardales-Luna*, 632 F.3d 731, 733 (1st Cir.) (when defendant failed to preserve claim raised by codefendants whose convictions were upheld, " 'accepted principles of stare decisis militate[d] strongly in favor of resolving identical points in the same way for identically situated defendants' "), cert. denied, 565 U.S. 1034, 132 S. Ct. 573, 181 L. Ed. 2d 421 (2011); *United States* v.

*Babwah*, 972 F.2d 30, 35 (2d Cir. 1992) (reversing defendant's conviction based on unpreserved claim when codefendant properly preserved claim and defendants were tried jointly and equally harmed, as manifest injustice would occur if conviction was not reversed); *United States* v. *Olano*, 934 F.2d 1425, 1439 (9th Cir. 1991) (it would be "manifestly unjust" to deem waived claim of inherently prejudicial procedural error when codefendant's conviction was reversed but both defendants "suffered the same prejudice from the same fundamental error in the same trial"), rev'd on other grounds, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993); *United States* v. *Rivera Pedin*, 861 F.2d 1522, 1526–27 n.9 (11th Cir. 1988) ("it [is] anomalous to reverse some convictions and not others when all defendants suffer from the same error"); *United States* v. *Gray*, 626 F.2d 494, 497 (5th Cir. 1980) ("[b]elieving it anomalous to reverse some convictions and not others when all defendants suffer from the same error, we consider the arguments to be adopted"), cert. denied sub nom *Fennell* v. *United States*, 449 U.S. 1038, 101 S. Ct. 616, 66 L. Ed. 2d 500 (1980), and cert. denied sub nom. *Wright* v. *United States*, 449 U.S. 1038, 101 S. Ct. 616, 66 L. Ed. 2d 500 (1980), and cert. denied, 449 U.S. 1091, 101 S. Ct. 887, 66 L. Ed. 2d 820 (1981), and cert. denied sub nom. *Barker* v. *United States*, 450 U.S. 919, 101 S. Ct. 1367, 67 L. Ed. 2d 346 (1981); *United States* v. *Anderson*, 584 F.2d 849, 853 (6th Cir. 1978) ("under the unique circumstances of this case [in which the codefendant preserved his claim and the defendant was equally harmed] it would be a manifest injustice to allow [the defendant's] conviction to stand while ordering a new trial for [his codefendant]"). But see *United States* v. *Massara*, 174 Fed. Appx. 703, 707 n.3 (3d Cir. 2006) ("[The defendant] asserts [that] he filed [his] motion [to challenge, for the first time, the jury instruction at trial that was the basis for the reversal of his codefendant's conviction] directly after learning [that] his [codefendant] . . . obtained reversal of her conviction on this ground. But [the codefendant], unlike [the defendant], raised the jury instruction issue on direct appeal.").

Because the defendant in the present case is not similarly situated to Jackson, it is not "anomalous" to treat him differently than Jackson, and, thus, fairness and justice do not require that we exercise our supervisory authority to reverse the defendant's conviction or treat his claim as preserved.

## II

The defendant next requests that we overrule our recent decision in *State* v. *Turner*, supra, 334 Conn. 671–72, in which we held that, although the new rule announced in *State* v. *Edwards*, supra, 325 Conn. 97, applied retroactively, this retroactivity did not excuse a defendant's failure to preserve his *Porter* claim. The

defendant argues that we should revisit our prior decision because our holding in *Turner* "belies logic, eschews the important policy considerations that underlie the general rule of retroactivity, and renders illusory any benefit defendants may have gained from retroactive application of newly announced rules." He asserts that, in reaching our holding in *Turner*, this court did not consider the purpose of the general rule regarding retroactivity—to ensure a law's integrity and consistent application. The defendant contends that the retroactive effect of the new rule announced in *Edwards* should excuse any preservation issues, and, thus, we should review his *Porter* claim despite his failure to raise it at trial. We decline to overrule our holding in *Turner* and, thus, decline to review the defendant's unpreserved *Porter* claim.

As discussed in part I of this opinion, the defendant did not object to Weaver's testimony or the corresponding slideshow depicting the location of his phone, Jackson's phone, and Anderson's GPS. Although the defendant filed a motion in limine before trial regarding any CSLI, requesting either the preclusion of this evidence or a *Porter* hearing,[6] the trial court did not rule on this motion. The defendant did not renew his request at trial.

After the defendant's trial, but while his appeal before the Appellate Court was pending, this court released *State* v. *Edwards*, supra, 325 Conn. 97. In *Edwards*, we held for the first time that expert testimony regarding cell phone data is the type of scientific evidence *Porter* contemplated, and, thus, a *Porter* hearing was required to ensure that this testimony was based on reliable scientific methodology. See id., 129–33. Specifically, in *Edwards*, "the state offered the testimony of Detective Christopher Morris of the Wethersfield Police Department regarding cell phone data and maps he generated therefrom. . . . The defendant objected to the admission of the maps and requested a *Porter* hearing, which the trial court denied. . . . On appeal in *Edwards*, the defendant argued to this court that the trial court improperly had failed to qualify Morris as an expert and denied his request for a *Porter* hearing. We agreed. . . . Specifically, we concluded that Morris should have been qualified as an expert witness before the court allowed him to testify regarding cell phone data because of his superior knowledge on this subject. . . . Additionally, we determined that expert testimony regarding cell phone data is the type of scientific evidence contemplated by *Porter*, and, thus, a *Porter* hearing was required to ensure that his testimony was based on reliable scientific methodology. . . . Nevertheless, we applied an evidentiary harmless error analysis, concluding that these errors had not harmed the defendant." (Citations omitted; footnote omitted.) *State* v. *Turner*, supra, 334 Conn. 671–72.

In light of our decision in *Edwards*, on direct appeal to the Appellate Court, the defendant in the present case raised a *Porter* claim for the first time, arguing both that it was preserved,[7] and, alternatively, that the rule of retroactivity overcame his failure to preserve this claim. *State* v. *Rogers*, supra, 183 Conn. App. 686 and n.16. The Appellate Court held that the defendant's *Porter* claim was not preserved and that, although the rule in *Edwards* was retroactive, retroactivity did not cure this lack of preservation. See id., 686, 686–87 n.16.

The defendant then sought certification to appeal to this court on the issue of whether his unpreserved *Porter* claim was reviewable in light of the retroactivity of the new nonconstitutional rule in *Edwards*. While the defendant's appeal was pending before this court, however, we decided this very issue in *State* v. *Turner*, supra, 334 Conn. 671–72. Specifically, the defendant in *Turner* did not preserve his *Porter* claim at trial, either by objecting to the admission of the CSLI testimony or the cell tower coverage maps, or by requesting a *Porter* hearing. Id. After the defendant's criminal trial in *Turner*, but while his appeal was pending before the Appellate Court, we released our decision in *Edwards*. As a result, on appeal before this court, the defendant in *Turner* argued that the rule in *Edwards* applied retroactively, and, as such, he was not required to preserve his *Porter* claim at trial to receive the benefit of the new rule. We held that, although the rule in *Edwards* was retroactive; see id., 677; "[r]etroactivity of new, nonconstitutional evidentiary rules does not relieve a defendant of his obligation to preserve the claim." Id., 679. In so holding, we relied on the following principles: (1) that the trial court need not hold a *Porter* hearing unless one is specifically requested; (2) we previously have held that, although new, nonconstitutional evidentiary rules are retroactive, the defendant still was required to preserve his claim at trial to be entitled to review; (3) fairness principles did not require application of the new rule in *Edwards* to all defendants; and (4), absent a timely objection, the record was inadequate to determine the defendant's *Porter* claim; see 678–80; because "we have no way of knowing whether the state would have presented additional evidence to support [the expert's] methodology and to show that the cell tower coverage maps were derived from this methodology if the defendant had requested a *Porter* hearing." Id., 681–82. Accordingly, in *Turner*, we declined to review the defendant's *Porter* claim.

"Our determination of whether we should overrule a prior decision is guided by the doctrine of stare decisis, which counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Internal quotation marks omitted.) *State* v. *Bischoff*, 337 Conn. 739, 762, 258 A.3d 14 (2021). "[W]e have always required a departure from

precedent to be supported by some special justification. . . . Such justifications include the advent of subsequent changes or development in the law that undermine[s] a decision's rationale . . . the need to bring [a decision] into agreement with experience and with facts newly ascertained . . . and a showing that a particular precedent has become a detriment to coherence and consistency in the law . . . ." (Citation omitted; internal quotation marks omitted.) *Sepega* v. *DeLaura*, 326 Conn. 788, 798–99 n.5, 167 A.3d 916 (2017).

Contrary to the defendant's contentions, we considered in *Turner* the same arguments that he raises in the present case. Specifically, we noted that this court consistently has held that "[r]etroactivity of new, nonconstitutional evidentiary rules does not relieve a defendant of his obligation to preserve the claim." *State* v. *Turner*, supra, 334 Conn. 679. We explained that it did not undermine fairness principles to treat the defendant in *Edwards* differently than the defendant in *Turner* because they were not similarly situated—one preserved the claim while the other did not. See id., 677, 680. This distinction was important because the defendant's failure to request a *Porter* hearing in *Turner* affected the adequacy of the record before this court. See id., 680. Moreover, our holding was consistent with the purpose of the retroactivity rule, which grants " '[c]omplete retroactive effect' " only to a new constitutional rule or a new judicial interpretation of a criminal statute. Id., 677 n.6.

Nevertheless, the defendant contends that our holding in *Turner* frustrates judicial economy by forcing attorneys to raise any conceivable legal claim in the hope that the law changes in the future. We disagree. Little more than two years have passed since our decision in *Turner*, and we are unaware of any detrimental effect caused by our holding. Moreover, our decision in *Turner* is of relatively recent vintage, and we are unaware of, and the defendant has not cited, changes or developments in the law that undermine our decision's rationale. See, e.g., *State* v. *Ward*, 341 Conn. 142, 151 n.4, 266 A.3d 807 (2021) (declining to overrule precedent of relatively recent vintage without showing that precedent creates unworkable scheme). As explained, this court has long held that it is not inconsistent for a new nonconstitutional rule to apply retroactively but to still require preservation of the claim at issue. Accordingly, we decline to overrule our holding in *Turner* and, thus, decline to review the defendant's unpreserved *Porter* claim.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] See *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

[2] We granted certification limited to the following issues: (1) "Does this court's decision in *State* v. *Jackson*, [supra, 334 Conn. 793], which directed that the conviction of the defendant in that case [Jackson] be reversed,

require that this court also reverse the conviction of Jackson's codefendant in the present case?" (2) "Is the defendant's unpreserved claim regarding the state's late disclosed expert witness on cell site location information reviewable?" And (3) "[w]as the testimony of the state's late disclosed expert on cell site location information, as well as any evidence admitted in connection with that testimony, harmful to the defendant?" *State* v. *Rogers*, 335 Conn. 917A, 244 A.3d 146 (2020).

[3] This court delayed granting certification to appeal in the present case pending our resolution of the certified appeal in *Turner*, which raised a similar issue regarding the retroactive application of *Edwards* to an unpreserved *Porter* claim. See part II of this opinion.

[4] The defendant also argues that exceptional circumstances justify the exercise of our supervisory authority because this court created new law in *Jackson* by providing additional guidance to trial courts regarding the need for a continuance when experts are involved. We disagree. In *Jackson*, we did not alter in any way the applicable legal principles or create any new standard but, rather, applied settled legal principles to the facts at issue.

The defendant further argues that *Jackson* constituted a change in the law as to this case, and, thus, our holding in *Jackson* that the trial court abused its discretion in not granting a reasonable continuance and that this error was harmful equally applies to the present case. This argument ignores the fact that Jackson and the defendant were not similarly harmed by this error.

[5] The defendant alternatively requests that this court exercise its supervisory authority to adopt a presumption that, unless explicitly stated on the record otherwise, an objection by one defendant will be presumed to be joined by all defendants when they are tried jointly. As discussed, however, this court already has recognized a rule that this court may treat as preserved an unpreserved claim that a codefendant, who was tried jointly with the defendant, properly preserved if the defendant is similarly situated and equally harmed. The fact that the defendant does not satisfy this rule does not justify this court's exercising its supervisory authority to create a presumption more beneficial to the defendant. Moreover, fairness and justice principles do not require that we adopt the defendant's proposed rule and overrule our prior case law when the preexisting rule creates no injustice, as the defendant is not similarly situated to Jackson.

[6] "In *Porter*, we followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that testimony based on scientific evidence should be subjected to a flexible test to determine the reliability of methods used to reach a particular conclusion. . . . A *Porter* analysis involves a two part inquiry that assesses the reliability and relevance of the witness' methods. . . . First, the party offering the expert testimony must show that the expert's methods for reaching his conclusion are reliable. . . . Second, the proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . . Put another way, the proponent of scientific evidence must establish that the specific scientific testimony at issue is, in fact, derived from and based [on] . . . [scientifically reliable] methodology." (Internal quotation marks omitted.) *State* v. *Turner*, supra, 334 Conn. 669; see also Conn. Code Evid. § 7-2, commentary (discussing requirements and scope of *Porter*).

[7] On appeal to this court, the defendant does not dispute that his *Porter* claim is unpreserved.